[No. C052286. Third Dist. Feb. 28, 2007.]

ALISSIA MYERS, Plaintiff and Appellant, v.
TRENDWEST RESORTS, INC., Defendant and Respondent.

1404

1406

 

COUNSEL

Law Offices of Stephan Williams, Stephan C. Williams; Law Offices of Julie Schumer and Julie Schumer for Plaintiff and Appellant.

Payne & Fears, Charles M. Louderback, Stacey L. Pratt and James T. Conley for Defendant and Respondent.

OPINION

**SIMS, Acting P. J.**—In this action alleging sexual harassment in employment under the Fair Employment and Housing Act (Gov. Code, § 12940 et seq. (FEHA))[1] and common law claims (sexual battery, false imprisonment, and intentional infliction of emotional distress), plaintiff Alissia Myers appeals from summary judgment entered in favor of her former employer, defendant Trendwest Resorts, Inc. (Trendwest). Plaintiff contends triable issues of material fact exist. Plaintiff also appeals from the trial court's award of attorney's fees to Trendwest under the FEHA.

We shall reverse the judgment because Trendwest (1) failed to show entitlement to judgment on the FEHA claims alleged in counts one and two and (2) failed to show entitlement to summary adjudication regarding the punitive damages alleged in count one. We shall affirm the trial court's grant of summary adjudication in favor of Trendwest on the other counts. We shall reverse the order awarding attorney's fees.

### STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment should be granted if the submitted papers show that "there is no triable issue as to any material fact," and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment meets his burden of showing that a cause of action has no merit if he shows that one or more elements of the cause of action cannot be established, or that there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2).) Once the defendant has met that burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists. (*Ibid.*) On appeal, we examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460 [30 Cal.Rptr.3d 797, 115 P.3d 77].) " 'First, we identify the issues raised by

---

[1] Undesignated statutory references are to the Government Code.

the pleadings, since it is these allegations to which the motion must respond; secondly, we determine whether the moving party's showing has established facts which negate the opponent's claims and justify a judgment in movant's favor; when a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue.' " (*Waschek v. Department of Motor Vehicles* (1997) 59 Cal.App.4th 640, 644 [69 Cal.Rptr.2d 296].)

## THE COMPLAINT

The operative pleading, the third amended complaint filed on February 16, 2005, alleged as follows:

Trendwest is an employer subject to the FEHA. Ayman Damlahki[2] is a project director (manager) at Trendwest's Roseville office and was acting within the scope of his employment.

Plaintiff alleged she began working for Trendwest in October 2001. During her employment, Damlahki continually and repeatedly harassed her by "numerous unwanted and unwelcome sexual advances, comments, innuendoes of a sexual nature, numerous non-consensual physical contacts with the body of plaintiff," all of which created an intimidating, oppressive, hostile and offensive work environment. On one or more occasions between October 2001 and December 2003, in Trendwest's office, Damlahki (a) told plaintiff she had a "nice ass"; (b) bragged of his sexual prowess and how he could satisfy plaintiff sexually; (c) repeatedly asked plaintiff to go out with him, knowing she had no interest in him as a romantic partner; (d) phoned plaintiff many times at home and attempted to engage her in conversations of a personal nature unrelated to work; (e) repeatedly asked plaintiff to visit him at his home, knowing she had no interest in doing so; (f) asked plaintiff to share a hotel room with him at Lake Tahoe; and (g) stalked plaintiff and frequently phoned her coworkers, seeking her whereabouts.

On May 29, 2003, plaintiff was engaged in a job assignment, accompanied by Damlahki. He persuaded her to accompany him in his car. Damlahki lured plaintiff to his residence, claiming he had to pick up something work related. He drove into his garage, closed the garage door, grabbed plaintiff's breasts, thrust his hand into her groin area, and urged plaintiff to have sex with him. Plaintiff attempted to resist these sexual advances but was overpowered.

In 2003, Trendwest implemented the Integrity line, an anonymous telephone complaint line operated by a third party vendor, which processed

---

[2] The complaint also named Damlahki as a defendant, but he is not a party to this appeal. We spell "Damlahki" as it is spelled in his declaration. Trendwest spells it "Damlakhi." Plaintiff persistently misspells it "Damlucki."

complaints and forwarded them to Trendwest for investigation. In July 2003, plaintiff's coworker Sandy Klein reported to Trendwest's Integrity line that she was being compelled to work in a hostile work environment, which included the sexual harassment of plaintiff. Trendwest did not contact plaintiff and did not take any corrective action, so that when plaintiff returned from a disability leave, Damlahki again harassed her.

On December 13, 2003, Trendwest discharged plaintiff from employment "in significant part because plaintiff had complained about the misconduct" of Damlahki.

In early January 2004, plaintiff contacted Trendwest's Integrity line and complained Damlahki sexually harassed her when she resumed active duty in November 2003. She is unaware of an investigation ever being conducted.

The complaint alleged the following counts:

(1) Sexual harassment under the FEHA;

(2) Failure to take reasonable steps to prevent sexual harassment, as required by the FEHA;

(3) Sexual battery (regarding the May 29, 2003, incident);

(4) Intentional infliction of emotional distress;

(5) Retaliatory discharge from employment;[3]

(6) False imprisonment (regarding May 29, 2003); and

(7) Quid pro quo sexual harassment.[4]

Plaintiff sought compensatory damages, injunctive relief regarding failure to take reasonable steps to prevent harassment, punitive damages, and attorney's fees.

While the complaint does not make clear whether the common law counts are alleged against Trendwest, rather than against Damlahki alone, Trendwest's summary judgment motion treated the complaint as alleging all counts against Trendwest.

---

[3] Plaintiff's appellate briefing presents no argument or analysis regarding the trial court's ruling on the retaliatory discharge count, and we therefore need not consider the matter. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273].)

[4] Plaintiff says she is not contesting the trial court's grant of summary adjudication in favor of Trendwest on the quid pro quo count.

## THE SUMMARY JUDGMENT MOTION

On June 21, 2005, Trendwest filed a motion for summary judgment or summary adjudication. The separate statement of undisputed facts asserted among other things:

Trendwest is in the business of time-share sales and resort development. Sales are generated by customers taking a tour of a Trendwest sales office. Although contrary to Trendwest policy, salespersons at the Roseville office on occasion offered to follow home customers who had failed to bring their checkbook or credit card—a practice the Roseville office called, "driving for dollars."

When plaintiff began working for Trendwest in October 2001, she and Damlahki both worked as salespersons at Trendwest's Walnut Creek sales office. In June 2002, plaintiff transferred to the Roseville office after Damlahki transferred there to be the project director. A project director manages the office and trains, motivates, and monitors the salespersons. It is within the project director's duties to be on site at all times in the office. While project directors have the authority to hire salespersons, they do not have the authority to fire or discipline any employee without conferring with the human resources department.

Plaintiff enjoyed making money and was highly motivated to make enough sales (100 time-shares in a calendar year) to earn bonuses of the President's Club.

When plaintiff was hired, she received information about Trendwest's policy against sexual harassment, and posters about the policy were posted in the Roseville office. In 2003, Trendwest instituted an anonymous complaint line called the Integrity line.

Trendwest accepted as undisputed fact for summary judgment purposes that Damlahki made sexual advances to plaintiff on two "driving for dollars" trips in March and May 2003. On the first occasion, he tried to touch her hair and leg, pretended to be lost, parked on an isolated dirt road, tried to kiss plaintiff, said he would like to sleep with her, touched her breasts, and touched her vagina through her underwear. He told her she should go along with him because he was her project director, and he would guarantee that she achieved the President's Club. On the second occasion, he drove her to his house, stating he wanted to show her some work-related documents and asked for five to 10 minutes of her personal time. Once inside his garage, he tried to kiss plaintiff, touched her breasts, put his hand up her dress, forced her hand down his pants between his pants and underwear, and tried to get

her to come inside his house. Plaintiff threatened to pepper spray him. He took her back to the office. Neither of them reentered the office.

Trendwest's motion also asserted that in December 2002, about a dozen workers from the Roseville office, including plaintiff and Damlahki, went to a bar for an informal social get-together not sponsored by Trendwest. Damlahki made people move so he could be next to plaintiff. When she leaned over the table, Damlahki whispered in her ear that she had nice breasts and he would like to see them again. Plaintiff was offended but said nothing because she is an attractive woman accustomed to this type of male attention. Plaintiff, Damlahki, and several others left the bar to go dancing. Plaintiff rode in Damlahki's car and invited him into her apartment when they stopped there on the way to the nightclub. At the club, Damlahki tried to dance close to plaintiff, but she rebuffed him. She says he asked her to give him a lap dance, and she was offended. She nevertheless accepted a ride home from Damlahki.

In January 2003, Damlahki began calling plaintiff at her home and on her cell phone after business hours. She says he called other Trendwest employees looking for her. Plaintiff estimated he called her between 60 and 70 times between January and June of 2003. He left messages wanting to know her whereabouts. She characterized the messages as rude but not sexual.

In February 2003, Damlahki began to offer to take plaintiff places unrelated to work, including dinner, the opera, Paris, Las Vegas, and San Francisco. Damlahki told her he had paid his wife $50,000 to go to Syria for a month, and if plaintiff went to Las Vegas with him for the weekend, he would do something similar for her. Plaintiff inferred he was offering her $50,000 to accompany him to Las Vegas for purely personal reasons. After stalling, she finally picked a date, thinking it would be a downpayment on a house, but they never went on the trip.

Plaintiff never made use of Trendwest's antiharassment policies until she called the Integrity line after her employment ended.

Trendwest submitted records showing plaintiff was terminated as of December 12, 2003, because she took leave of absence longer than six months, which made her subject to administrative termination.

Responding to plaintiff's claim that coworker Sandy Klein complained about Damlahki, Trendwest submitted excerpts of Klein's deposition, in which Klein denied calling the Integrity line on behalf of herself or plaintiff. Klein also said she was never sexually harassed by Damlahki, and plaintiff never told her about any harassment.

Trendwest's vice-president for human resources, Kent R. Keoppel, submitted a declaration attesting that Trendwest does not sponsor or have mandatory

events for employees at bars or nightclubs. The only event Trendwest sponsors is an annual holiday party. Keoppel attested, "It is contrary to Trendwest policy for salespeople to leave a sales office and follow a timeshare buyer to their residence to obtain payment." He also said that, throughout plaintiff's tenure, Trendwest had a policy against sexual harassment that was distributed to all employees and conducted antiharassment training. Trendwest received no complaint of sexual harassment against Damlahki on its Integrity line before plaintiff filed this action.

Trendwest's vice-president for Northern California, Kevin Fiore, attested Trendwest's policy was for customers to come to a Trendwest sales office with their credit card or checkbook. Salespeople at Trendwest's Roseville office came up with the idea of "driving for dollars" to follow customers home if they failed to bring their checkbook or credit card. This practice was against Trendwest policy. Fiore also described the President's Club as a reward for top salespersons.

Trendwest argued it was entitled to summary judgment or summary adjudication of each count because (1) Damlahki's actions were personally motivated, outside the scope of his employment, and unforeseeable to Trendwest; (2) his actions did not constitute severe and pervasive conduct; (3) plaintiff never availed herself of Trendwest's policies and procedures to prevent sexual harassment; and (4) Trendwest's conduct was not outrageous or intentional. Trendwest also sought summary adjudication of the punitive damages claim, as we discuss, *post*.

## THE OPPOSITION

Plaintiff filed an opposition to the summary judgment motion.[5]

Plaintiff submitted her own declaration attesting she was a successful salesperson at Trendwest until she suffered a mental breakdown in June 2003, as a result of Damlahki's harassment. She returned to work on November 15, 2003. Despite promises to stop, Damlahki resumed his sexual advances. She had a second mental breakdown and was hospitalized on December 7, 2003. Shortly after she returned to work in December 2003, Trendwest terminated her employment.

---

[5] Damlahki also filed an opposition to Trendwest's summary judgment motion. The trial court denied Trendwest's motion to strike Damlahki's opposition.

On January 7, 2004, plaintiff called the Integrity line and complained about Damlahki's sexual harassment. Plaintiff later called the Integrity line for an update but was told they had no record of her having made a complaint.[6]

Plaintiff attested: "In approximately September or October 2003 I learned that most of the employees in the Roseville office were asked to and did in fact attend sessions, lectures, seminars on the policies of the company in reference to discrimination and harassment. <u>I never was invited nor did I attend</u> these lectures, etc [*sic*] <u>on the subject of harassment and/or discrimination.</u>" Plaintiff ambiguously attested, "the <u>only</u> information I received on the subject of Trendwest's discrimination policy was contained in the employee handbook,"[7] but she never received any of the discrimination and harassment policies that Trendwest said it distributed to every employee.

Regarding her failure to call the Integrity line sooner, plaintiff attested: "Prior to December 2003, aside from the name (integrity line) I knew little about its role or function in respect to reporting complaints of discrimination. Moreover . . . we in the Roseville office had on many occasions been told by [Damlahki] that we were not to 'go over his head' for any problems that may arise from our employment. He let it be known, in no uncertain terms, that if an employee in the office did 'go over his head' and report a problem to personnel, or anyone senior to [Damlahki], that he would fire her or him. Since I had personally witnessed him fire at least three employees while I served under him, I had no reason to believe that he would not carry out his threat." Plaintiff asserted that, when she was in the hospital in June 2003, coworker Sandy Klein called the Integrity line to report a problem and also informed them that plaintiff was being sexually harassed. There was no followup.

On May 29, 2003, Damlahki insisted on accompanying plaintiff to "driv[e] for dollars" though she did not need him, Damlahki drove her in his car. They talked about work-related matters. He had viewed a tape of a presentation she gave, and he offered suggestions for improvement. He spoke about achieving success on the job. He said, "you hang around people that are successful if you want to be successful yourself." He said he was successful. Plaintiff

---

[6] One page of plaintiff's declaration says she called back approximately one week later, while another page says it was approximately two weeks later. Plaintiff attested that she attached to her declaration a record from the phone company reflecting her contacts with the Integrity line. However that attached exhibit was one page of a request for production of documents with an unsigned signature line for *plaintiff's* attorney. The request asks for audiotapes of conversations between plaintiff and the phone number which plaintiff says is the Integrity line, with the time and length of the calls specified. There is nothing to indicate this information was provided by the phone company.

[7] The record contains a copy of page 11 of the employee handbook stating Trendwest's policy that it will not tolerate sexual harassment by supervisors or by any employee.

inferred he was saying she should hang out with him. He also complained about his wife, who was in Syria. At the customer's house, Damlahki waited in the car while plaintiff went in and transacted business. Then, instead of driving plaintiff back to the office, Damlahki took her to his home, over her protests.

Plaintiff's declaration then refers the reader to her deposition transcript, in which she said that, after they left the customer's house, Damlahki put his hand on her leg and told her he could please her sexually. He tried to put her hand on his leg. She was scared. She objected when he drove past the exit to the office. He said he wanted to take her to his house for 10 minutes. She said no. He pulled into his garage, shut the door by remote control, then leaned over, pushed himself onto her and kissed her on the mouth while trying to put his hand up her dress. He continued groping her as she got out of the car and tried to get away from him. He pushed her up against the car and kissed her again. He unbuttoned some buttons on her dress and touched her bra and her breasts. When she managed to get out of the garage into the front yard, he stopped and apologized. He drove her back to the office. She did not tell anyone what happened because she was scared and was making good money.

Plaintiff's declaration attested that Damlahki asked her numerous times to go away with him on expense-paid weekend trips. She understood he was tying these "gifts" to sexual favors. Plaintiff said she received favorable treatment from Damlahki in that he kept her name on the "owner referral board" even when she was late or missed work, which should have made her ineligible for the board.

Plaintiff submitted her own separate statement of facts, asserting (1) Damlahki fired at least three persons at the Roseville office; (2) Trendwest knew he was a poor manager who frequently acted irrationally, threw tantrums, and intimidated his subordinates; (3) the employee handbook did not contain information required by the FEHA; (4) Trendwest did not have plaintiff participate in any seminar concerning harassment and did not adequately train project managers in handling harassment complaints; (5) discrimination complaints were not well received by senior management; and (6) other sexual harassment claims were filed by Trendwest employees. Plaintiff supported these assertions with her own declaration and deposition excerpts of former Trendwest manager Marlene Martin.

THE REPLY

Trendwest filed a reply. Trendwest replied, "IMMATERIAL" to many of plaintiff's assertions and filed multiple evidentiary objections to plaintiff's declaration and Marlene Martin's deposition excerpts.

## THE RULING

After the trial court allowed plaintiff to submit some revised papers to correct deficiencies in her opposition papers and sustained Trendwest's objections to unauthorized revisions, the trial court issued a written order granting summary judgment.

As to evidentiary objections, the trial court overruled Trendwest's objections to plaintiff's declaration and Martin's deposition excerpts. The court sustained Trendwest's objections to (1) Damlahki's "supplemental response to plaintiff's separate statement" and (2) plaintiff's revised/amended separate statement.

The trial court explained its reasoning for granting summary adjudication of each count of the complaint, as follows:

The first and third counts, for sexual harassment (FEHA) and sexual battery, failed because the alleged incidents took place outside the workplace. Although the March 2003 and May 2003 incidents occurred while returning from customers' homes, Damlahki's actions were no longer related to his employer's interests as soon as he diverted from a return to the office and went to an isolated road or to his garage. Damlahki's declaration did not raise a triable issue of fact. Whether or not "driving for dollars" was a Trendwest policy, as soon as Damlahki deviated from that task, he was no longer acting for Trendwest's benefit, but for his own personal gratification. Plaintiff conceded Damlahki's improprieties were for his own gratification. The alleged incidents were not work related or sanctioned by Trendwest. Damlahki's argument that the salesperson-mentor relationship might lead to improprieties was unconvincing to the trial court. The relationship is not such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought. Damlahki's statements that any contact with plaintiff was encouraged by Trendwest as team building was a conclusion without factual support. There was no evidence Trendwest paid for the ski trip to Tahoe. Even if Trendwest had funded that trip, Damlahki's alleged groping would have been for his gratification, not Trendwest's. Trendwest's ultimate responsibility for placing plaintiff and Damlahki in a common business location was not sufficient to establish the existence of a triable issue of material fact. Plaintiff had not established conduct so pervasive as to alter the condition of employment. Prior to her termination, plaintiff did not complain, and she continued to associate with Damlahki outside of work, e.g., she rode with him to Lake Tahoe seven months after the incident at his house.

The second count (failure to take reasonable steps to prevent harassment under the FEHA) failed because plaintiff conceded that failure to prevail on

her battery/harassment claims precluded recovery on this count. Further, Trendwest's alleged knowledge that Damlahki was a "loose cannon" and that he lacked judgment, intelligence, maturity and management skills, did not constitute evidence that Trendwest knew it needed to take additional steps to prevent sexual harassment beyond those in its established sexual harassment program. Plaintiff alleged she made a complaint to Trendwest, via its Integrity line, in January 2004, after her termination. There was no record of that complaint.

The fourth count (intentional infliction of emotional distress) failed for the same reasons as the first and third counts. Damlahki's conduct, even if it rose to a level actionable against him, could not be imputed to Trendwest because it was unrelated to his employment, took place outside of the work environment, outside the course and scope of employment, and was for Damlahki's personal gratification only.

The fifth count (retaliation) failed because plaintiff conceded she did not have sufficient evidence to support this cause of action.

The sixth count (false imprisonment) failed because Damlahki acted for his own personal gratification, and his conduct could not be imputed to Trendwest.

The seventh count (quid pro quo sexual harassment) failed. Plaintiff attested Damlahki implied that going away with him on weekend trips would help her career. Yet she provided no evidence that her employment or advancement was conditioned in any way on a favorable response. Indeed, in the same declaration, plaintiff stated Damlahki placed her on the coveted "owner referral board" even though she missed days at work, which should have disqualified her, and she never went on a weekend trip with him.

The trial court further concluded that, in the absence of any wrongful conduct by Trendwest, plaintiff's claim for punitive damages against Trendwest also failed.

Judgment was entered on January 24, 2006. Notice of entry of judgment was served on January 31, 2006.

### ATTORNEY'S FEES

Trendwest filed a motion for attorney's fees under section 12965, subdivision (b), which gives the trial court discretion to award attorney's fees to the prevailing party in an FEHA case. The motion sought $125,000. However,

the trial court reduced the award to $40,000, based on its conclusion that only some of the counts were frivolous (the standard set by case law).

Plaintiff filed a timely notice of appeal from the judgment and the order granting attorney's fees.

## DISCUSSION

### I. *Counts Not at Issue on Appeal*

As indicated (fns. 3 & 4, *ante*), plaintiff on appeal presents no argument or analysis regarding count five (retaliatory discharge) and expressly states she does not contest the trial court's adverse ruling on count seven (quid pro quo sexual harassment). We therefore need not discuss those counts and shall affirm the trial court's grant of Trendwest's motion for summary adjudication as to counts five and seven. We now turn to the counts at issue on appeal.

### II. *Count One—Sexual Harassment Under the FEHA*

Plaintiff argues Trendwest failed to show entitlement to summary judgment/adjudication on count one, sexual harassment in violation of the FEHA. We agree.

First, it is obvious this case includes conduct prohibited by the FEHA, i.e., conduct sufficiently severe or pervasive as to alter the conditions of the victim's employment and create a hostile or abusive work environment. (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 284 [42 Cal.Rptr.3d 2, 132 P.3d 211].) We need not discuss each act alleged by plaintiff, because Damlahki's physical groping of plaintiff during "driving for dollars" in and of itself constitutes actionable conduct sufficient to defeat summary judgment/adjudication of the FEHA claims.

In deciding whether Trendwest can be liable under the FEHA for conduct by Damlahki (who was plaintiff's supervisor), we are guided by the California Supreme Court's discussion of the FEHA in *State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026 [6 Cal.Rptr.3d 441, 79 P.3d 556] (*Health Services*):

"The FEHA imposes two standards of employer liability for sexual harassment, depending on whether the person engaging in the harassment is the victim's supervisor or a nonsupervisory coemployee. The employer is liable for harassment by a nonsupervisory employee only if the employer (a) knew or should have known of the harassing conduct and (b) failed to take

immediate and appropriate corrective action. (§ 12940, subd. (j)(1).[8]) This is a negligence standard. [Citation.] Because the FEHA imposes this negligence standard only for harassment 'by an employee other than an agent or supervisor' (§ 12940, subd. (j)(1)), by implication the FEHA makes the employer strictly liable for harassment by a supervisor. [The California Supreme Court] and the Courts of Appeal have so stated. [Citations to cases dating back to 1989.]

██ "The applicable language of the FEHA does not suggest that an employer's liability for sexual harassment by a supervisor is constrained by principles of agency law. Had the Legislature so intended, it would have used language in the FEHA imposing the negligence standard of liability on acts of harassment by an employee 'other than an agent,' 'not acting as the employer's agent,' or 'not acting within the scope of an agency for the employer.' By providing instead in section 12940, subdivision (j)(1), that the negligence standard applies to acts of harassment 'by an employee other than an agent *or supervisor*[,]' . . . the Legislature has indicated that *all* acts of harassment by a supervisor are to be exempted from the negligence standard, whether or not the supervisor was then acting as the employer's agent, and that agency principles come into play only when the harasser is *not* a supervisor." (*Health Services, supra*, 31 Cal.4th at pp. 1040–1041.) The Supreme Court concluded that "under the FEHA, an employer is strictly liable for *all* acts of sexual harassment by a supervisor." (*Id.* at p. 1042.)

*Health Services, supra*, 31 Cal.4th 1026, added: "Of course, this analysis assumes the supervisor is acting in the capacity of supervisor when the harassment occurs. The employer is not strictly liable for a supervisor's acts of harassment resulting from a completely private relationship unconnected with the employment and not occurring at the workplace or during normal working hours. But instances of such harassment must be rare." (*Id.* at p. 1041, fn. 3.)

██ The Supreme Court also said an employee's failure to avail herself of available protections offered by the employer (a point asserted by Trendwest in this case) may reduce the amount of damages for which the employer was

[8] Section 12940, subdivision (j)(1), provides in part: "Harassment of an employee . . . by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An employer may also be responsible for the acts of nonemployees, with respect to sexual harassment of employees . . . where the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action. . . . An entity shall take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits shall not be necessary in order to establish harassment." (§ 12940, subd. (j)(1).)

liable, but it would not provide the employer a complete defense. (*Health Services, supra*, 31 Cal.4th at p. 1042.)

*Health Services, supra*, 31 Cal.4th 1026, reversed a summary judgment in favor of the employer and remanded for further proceedings. (*Id.* at p. 1049.) The Supreme Court reiterated the limits of its holding: "An employer continues to be strictly liable for hostile environment sexual harassment by a supervisor. An employee's failure to report harassment to the employer is not a defense on the merits to the employee's action under the FEHA, but at most it serves to reduce the damages recoverable. And it reduces those damages only if, taking account of the employer's antiharassment policies and procedures and its past record of acting on harassment complaints, the employee acted unreasonably in not sooner reporting the harassment to the employer." (*Ibid.*)

Since an employee's failure to avail herself of available protections does not provide the employer with a complete defense, the posture of this appeal from summary judgment does not require us to address the parties' dispute about whether Trendwest adequately advised plaintiff of the availability of a grievance procedure.

Here, the trial court granted summary adjudication of the FEHA claims because the incidents took place outside the workplace, were not work related, and Damlahki was acting for his own personal interests rather than Trendwest's interests.

■ The trial court erred because, in order for the employer to avoid strict liability for the supervisor's actions under the FEHA, the harassment must result from a completely private relationship unconnected with the employment. Otherwise, the employer is strictly liable for the supervisor's actions regardless of whether the supervisor was acting as the employer's agent. (*Health Services, supra*, 31 Cal.4th at p. 1041 & fn. 3.)

■ Here, the harassment did not result from a completely private relationship unconnected with the employment. There was no personal dating relationship between plaintiff and Damlahki at the time of the most significant incidents, which occurred during the "driving for dollars" excursions. The "driving for dollars" excursions were obviously connected with the employment and of obvious benefit to the employer's enterprise. Although there is some evidence that Trendwest did not approve of "driving for dollars," the evidence was conflicting on the point (precluding summary adjudication), and even if Trendwest did not approve of the practice, it admittedly was aware of the practice, clearly would benefit from the practice, and did nothing to stop it.

On appeal, Trendwest does not mention *Health Services, supra*, 31 Cal.4th 1026, though it was cited by plaintiff in the trial court and on appeal. Trendwest instead focuses on a federal case cited by plaintiff on appeal (*Sparks v. Pilot Freight Carriers, Inc.* (11th Cir. 1987) 830 F.2d 1554) and argues plaintiff for the first time on appeal argues that general agency principles preclude application of respondeat superior in the context of this case, where the harasser is a supervisor. Trendwest argues plaintiff cannot raise a new argument on appeal and in any event reads the federal case too broadly. Trendwest argues the sexual contact during the "driving for dollars" excursions occurred *away from the workplace* and therefore require application of respondeat superior principles. Trendwest argues that, even if there was a work-related purpose at the outset of the excursions, that purpose was completed by the time the tortious conduct occurred. Under Trendwest's reasoning, it would appear an employer would never be liable for sexual harassment by a supervisor, because the act of sexual harassment is never work related. The gropings occurred during the "driving for dollars" excursions, which were clearly work related. In any event, we need not address the federal case because we have already explained our conclusion is guided by *Health Services, supra*, 31 Cal.4th 1026.

Moreover, Trendwest goes too far in trying to inject respondeat superior principles into an employer's strict liability for supervisors' misconduct under the FEHA. The California Supreme Court said in a footnote in *Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992 [47 Cal.Rptr.2d 478, 906 P.2d 440] (*Farmers*) (a case which we address in detail in our discussion of the common law claims, *post*) that "regulations enacted by the Fair Employment and Housing Commission (FEHC) indicate that respondeat superior and scope of employment principles are supposed to play an integral role in fixing an employer's liability for both supervisor and nonsupervisor sexual harassment under the FEHA. (See Cal. Code Regs., tit. 2, § 7286.6, subd. (b).) Yet it is reasonably clear that the purpose underlying the comprehensive statutory scheme is to ensure that all employers maintain their worksites free from prohibited sexual harassment, regardless of the lack of foreseeability of such harassment in their particular enterprises. (See Stats. 1984, ch. 1754, pp. 6403–6404.) Under the FEHA, however, there is a need to determine whether sexual conduct that occurs off the worksite or after working hours constitutes an 'unlawful employment practice' within the ambit of the act. (§ 12940.) Although rigid principles of respondeat superior would not appear to apply to FEHA claims, they do provide guidance in such determinations. [Citations.]" (*Farmers, supra*, 11 Cal.4th at p. 1016, fn. 14.)

The regulation cited in the *Farmers* footnote (Cal. Code Regs., tit. 2, § 7286.6, subd. (b)) states: "Liability of Employers. In view of the common law theory of *respondeat superior* and its codification in California Civil Code

Section 2338,[9] an employer or other covered entity shall be liable for the discriminatory actions of its supervisors, managers or agents committed within the scope of their employment or relationship with the covered entity or, as defined in Section 7287.6 (b) [affirmative defense of business necessity to overcome facially neutral practice which has discriminatory effect], for the discriminatory actions of its employees where it is demonstrated that, as a result of any such discriminatory action, the applicant or employee has suffered a loss of or has been denied an employment benefit." (Cal. Code Regs, tit. 2, § 7286.6, subd. (b), italics added.)

The *Farmers* footnote also cited *Capitol City Foods, Inc. v. Superior Court* (1992) 5 Cal.App.4th 1042 [7 Cal.Rptr.2d 418], in which we held an employer was entitled to summary judgment on an FEHA claim where an employee claimed her supervisor raped her at his parent's house after she agreed to meet him for a date. We said that regulations promulgated under the FEHA indicated that, under the theory of respondeat superior, an employer is liable for harassment by supervisors committed within the scope of employment or the relationship with the employer. (*Capitol City Foods*, at p. 1047.) The employer argued that, before it could be held strictly liable for the harassing conduct of an employee, even one in a supervisory position, agency principles must first be applied. (*Ibid.*) The employer noted the supervisor was off duty during the incident, the parties agreed to the date, there was no evidence he used his authority as a supervisor to compel the plaintiff's presence, and the fact that he made a phone call to excuse her from work was insufficient to bring his conduct within the scope of employment. (*Id.* at pp. 1048, 1050.) Agreeing that the employer was entitled to summary judgment, we said harassing conduct need not occur in the workplace, but it must occur in a work-related context. (*Ibid.*) We cited a precedential decision of FEHC (Fair Employment and Housing Commission) that where a supervisor exerted and exploited his authority to compel an employee's attendance at several meals away from the office, the use and abuse of his supervisory status sufficed to bring within the ambit of the FEHA the sexually harassing conduct that occurred away from the workplace. (*Capitol City foods*, at pp. 1048–1049, citing *DFEH v. Bee Hive Answering Service* (June 7, 1984) FEHC Dec. No. 84-16.) We also said the FEHC "has applied common law agency principles to determine whether sexually harassing conduct was work-related." (*Capitol City Foods*, at p. 1049.) Even assuming the rape would not have occurred but for his position as the plaintiff's supervisor, the employer conclusively refuted the allegation that the supervisor forced the

---

[9] Civil Code section 2338 provides: "Unless required by or under the authority of law to employ that particular agent, a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business, and for his willful omission to fulfill the obligations of the principal."

plaintiff to accompany him or coerced her in any way prior to her entering his bedroom. His phone call to excuse her from work was insufficient to support an inference that he was acting within the scope of his employment. (*Id.* at pp. 1049–1050.)

From the foregoing precedents, the Second Appellate District, in holding a demurrer was erroneously sustained, "distill[ed] the principle that while an employer's liability under the [FEHA] for an act of sexual harassment committed by a supervisor or agent is *broader* than the liability created by the common law principle of respondeat superior, respondeat superior principles are nonetheless relevant in determining liability when . . . the sexual harassment occurred away from the workplace and not during work hours." (*Doe v. Capital Cities* (1996) 50 Cal.App.4th 1038, 1048–1049 [58 Cal.Rptr.2d 122] [aspiring actor's complaint adequately alleged a viable FEHA claim against casting director's employer for rape at a meeting at the casting director's home on a Sunday].)

As clarified in the more recent case of *Health Services, supra,* 31 Cal.4th 1026, however, an employer's FEHA liability for sexual harassment by a supervisor is not constrained by principles of agency law, unless the supervisor is not acting in the capacity of supervisor when the harassment occurs, but such cases will be rare, i.e., where the supervisor's acts of harassment result from a completely private relationship unconnected with the employment and not occurring at the workplace or during normal working hours. (31 Cal.4th at p. 1041 & fn. 3.)

Here, as indicated, the worst incidents occurred during working hours but away from the office during the "driving for dollars" incidents. Trendwest has not shown with undisputed evidence that there was any personal consensual dating relationship between plaintiff and Damlahki. That Damlahki sometimes socialized with his staff outside the office does not establish a personal dating relationship between him and plaintiff. Although there is evidence plaintiff agreed to go away with him on a personal trip to Las Vegas, her evidence indicated she felt coerced, and the trip never happened. At best for Trendwest, the matter would present a triable issue, precluding summary adjudication.

Trendwest suggests that none of the foregoing discussion matters, because plaintiff has failed to address an additional ground for the trial court's grant of summary judgment, i.e., that plaintiff failed to show she was bothered by Damlahki's conduct in that she failed to complain of his conduct during her employment and continued to socialize with him outside the office. Trendwest notes a plaintiff who does not perceive the workplace as hostile or abusive will not prevail, even if it is objectively so. (*Lyle v. Warner Brothers Television*

*Productions, supra,* 38 Cal.4th at p. 284.) However, a triable issue precludes summary adjudication, since plaintiff presented evidence (her declaration) that she was committed to a mental hospital in June 2003 (shortly after the March and May 2003 "driving for dollars" incidents), for a mental breakdown she attributes to the harassment, and she later returned to work because Damlahki promised to leave her alone (a promise he broke).

We conclude the trial court erred in granting summary adjudication of plaintiff's FEHA claims because Trendwest failed to show entitlement to summary adjudication of count one, FEHA sexual harassment. Our conclusion requires reversal of the judgment. However, Trendwest moved in the alternative for summary adjudication of each cause of action. We therefore address the parties' contentions about the other counts of the complaint.

### III. *The Other FEHA Claim*

Count two of plaintiff's complaint alleged failure to take reasonable steps to prevent sexual harassment as required by the FEHA.

The trial court granted Trendwest's motion for summary adjudication of count two because "[p]laintiff concedes that failure to prevail on her battery/harassment causes of action precludes recovery. Further, Trendwest's knowledge that Damlahki was a 'loose cannon' and that he 'lacked judgment, intelligence, maturity and management skills,' does not evidence Trendwest's knowledge that it needed to take additional steps to prevent sexual harassment by Damlahki beyond those in its established sexual harassment program."

Since we reverse summary adjudication of the FEHA harassment claim (count one), the trial court's first ground cannot stand. We need not decide the validity of the second ground given by the trial court, because we agree with plaintiff that summary adjudication of count two was precluded by the existence of a triable issue as to whether Trendwest complied with its statutory obligation (§ 12950) to inform plaintiff of remedies available through the Department of Fair Employment and Housing (DFEH) and FEHC.

■ Thus, count two alleged in part that Trendwest violated section 12950, which requires in part that employers provide employees with information about "[t]he legal remedies and complaint process available through the department and the commission," and "[d]irections on how to contact the department and the commission." (§ 12950, subd. (b)(5)–(6).) The remedy for a violation of section 12950 is injunctive relief, which is what plaintiff sought. (§ 12950, subd. (e).)

Trendwest failed to show it complied with section 12950, a defect noted in plaintiff's appellate brief. Trendwest asserted it distributed information about its antiharassment policy to employees and had posters regarding sexual harassment in its Roseville office, but Trendwest's separate statement of undisputed facts said nothing specific about informing employees of DFEH and FEHC. On appeal, Trendwest says it provided competent evidence that a DFEH pamphlet was distributed to all Northern California employees, but plaintiff denied receiving it. However, Trendwest merely presented a copy of a DFEH pamphlet (DFEH-185 (4/01)) attached to a June 2005 declaration of Trendwest's human resources vice-president, Kent Keoppel, indicating Trendwest distributes this pamphlet to employees. We see nothing showing this pamphlet was distributed during plaintiff's tenure. Keoppel's declaration also said that throughout plaintiff's tenure, Trendwest had a policy against sexual harassment, of which it informed employees. Again, we see nothing showing that during plaintiff's employment Trendwest advised employees of DFEH's complaint process or gave directions on how to contact DFEH. We reject Trendwest's argument that plaintiff must show authority that her nonreceipt of the pamphlet raises a triable issue where Trendwest had equivalent policies and procedures in place. Trendwest's institution of its own grievance procedure does not excuse its violation of section 12950. Additionally, plaintiff presented evidence suggesting Damlahki dissuaded his subordinates from complaining about him to his superiors.

We conclude Trendwest failed to show the absence of a triable issue on count two, failure to take reasonable steps required by the FEHA.

Plaintiff also sought damages under count two for failure to take all reasonable steps under another statute, section 12940. We need not address the parties' arguments on this point, because Trendwest's failure to disprove a section 12950 violation precludes summary adjudication on count two.

We conclude Trendwest failed to show entitlement to summary adjudication on count two.

### IV. *The Common Law Claims*

Plaintiff argues the trial court erred in granting summary adjudication as to the common law claims of sexual battery (count three), false imprisonment (count six), and intentional infliction of emotional distress (count four). We disagree.

 There is no common law cause of action for sexual harassment, but conduct constituting sexual harassment may be alleged in common law claims such as battery and intentional infliction of emotional distress. (*Medix*

*Ambulance Service, Inc. v. Superior Court* (2002) 97 Cal.App.4th 109, 118–119 [118 Cal.Rptr.2d 249].)

The trial court ruled that Damlahki's conduct could not be imputed to Trendwest because his conduct was unrelated to his employment, took place outside the workplace, and was for Damlahki's personal gratification only.

■ We observe two doctrines may be implicated in assessing liability against an employer. One doctrine is respondeat superior, pursuant to which the employer is indirectly or vicariously liable for torts committed by its employees within the scope of their employment. (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 208 [285 Cal.Rptr. 99, 814 P.2d 1341] (*Mary M.*).) The other doctrine is an agency theory pursuant to which an employer may be directly liable for acts of its agents. "Vicarious liability based on the tort doctrine of respondeat superior and direct liability based on the theory of actual or ostensible agency are different liability theories which cases do not always distinguish between. [Citation.]" (*Inter Mountain Mortgage, Inc. v. Sulimen* (2000) 78 Cal.App.4th 1434, 1440, fn. 4 [93 Cal.Rptr.2d 790].)

Plaintiff has not clearly presented a theory of direct liability based on agency in connection with the common law counts.[10] We therefore need not consider it as a separate doctrine. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834].) However, as we discuss, *post*, there is some overlap, and plaintiff does argue that Trendwest can be vicariously liable for Damlahki's misuse of his supervisory authority.

We turn to the respondeat superior theory. Plaintiff focuses on the trial court's comments that Damlahki's detour in his car during "driving for dollars" took him outside the scope of employment. Plaintiff argues "driving for dollars" was a "special errand" within the scope of respondeat superior, and the trip was still work related even when Damlahki took a detour to molest plaintiff. Even accepting plaintiff's arguments on these points, however, they are not enough to defeat summary adjudication in favor of Trendwest.

We take guidance from the analysis of the Supreme Court in *Farmers, supra*, 11 Cal.4th 992. *Farmers* is not directly on point because it involved a public employer, and the issue was whether the employee's conduct was within the scope of employment so as to trigger the employer's duty to defend the employee under the Tort Claims Act. (Gov. Code, §§ 995–996.6.)

---

[10] Trendwest argues plaintiff should not be allowed to argue general agency principles for the first time on appeal, with respect to the FEHA. We have already resolved the FEHA counts, without reliance on new arguments.

However, the Supreme Court said the Tort Claims Act was governed by the general principles of the respondeat superior doctrine in actions by third persons against the employer for the torts of the employee. (*Farmers, supra,* 11 Cal.4th at p. 1003.) Ordinarily, scope of employment presents a question of fact, but it becomes a question of law when the facts are undisputed and no conflicting inferences are possible. (*Farmers, supra,* 11 Cal.4th at p. 1019.)

*Farmers, supra,* 11 Cal.4th 992, was an indemnification suit by a male deputy sheriff and his homeowners insurance company to recover from his employer (the county) money he paid to settle a federal court action brought against him by female deputy sheriffs for sexual harassment (FEHA and common law claims). (11 Cal.4th at pp. 999–1000.) He admitted conduct such as touching one female's thighs, slapping another's buttocks, telling the females he wanted to "eat pussy" and "butt fuck" them, and telling one female he was supervising that she would have to "give him head", to complete her training. (*Id.* at p. 998.) At trial in the federal court, some of the females obtained a judgment against the employer under the FEHA. (11 Cal.4th at p. 1000.) In the state court indemnification action, the trial court granted summary judgment to the employer, concluding the male deputy's conduct was outside the scope of employment as a matter of law. (*Id.* at pp. 1000–1001.) The Court of Appeal reversed. The Supreme Court reversed the Court of Appeal.

*Farmers, supra,* 11 Cal.4th 992, reiterated scope of employment principles under the respondeat superior doctrine, stating an employer is liable for risks arising out of the employment. (*Id.* at p. 1003.) A risk arises out of the employment when in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. Where the question is one of vicarious liability, the inquiry should be whether the risk was one that may fairly be regarded as typical of or broadly incidental to the enterprise undertaken by the employer. Accordingly, the employer's liability extends beyond his actual or possible control of the employee to include risks inherent in or created by the enterprise. (*Ibid.*) One way to determine whether a risk is inherent in, or created by, an enterprise is to ask whether the actual occurrence was a generally foreseeable consequence of the activity. (*Id.* at p. 1004.) However, foreseeability in this context must be distinguished from foreseeability as a test for negligence. (*Ibid.*) In the latter sense "foreseeable" means a level of probability that would lead a prudent person to take effective precautions, whereas "foreseeability" as a test for respondeat superior merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the resulting loss in the employer's cost of doing business. (*Ibid.*)

■ *Farmers, supra*, 11 Cal.4th 992, said scope of employment has been interpreted broadly under the respondeat superior doctrine in California. (*Id.* at p. 1004.) For example, the fact that an employee is not engaged in the ultimate object of his employment at the time of his wrongful act does not preclude attribution of liability to an employer. Acts necessary to the comfort, convenience, health, and welfare of the employee while at work, though strictly personal and not acts of service, do not take the employee outside the scope of employment. (*Ibid.*) Moreover, when an employee is combining his own business with that of his employer, or attending to both at substantially the same time, " ' "no nice inquiry will be made as to which business he was actually engaged in at the time of injury, unless it clearly appears that neither directly nor indirectly could he have been serving his employer." ' " (*Ibid.*) An employer's vicarious liability may extend to willful and malicious torts of an employee as well as negligence, and employee's tortious act may be within the scope of employment even if it contravenes an express company rule and confers no benefit to the employer. (*Ibid.*)

■ *Farmers, supra*, 11 Cal.4th 992, said: "Notwithstanding the generally broad view given to scope of employment determinations, the law is clear that an employer is not strictly liable for all actions of its employees during working hours. Significantly, an employer will not be held vicariously liable for an employee's malicious or tortious conduct if the employee *substantially* deviates from the employment duties for personal purposes. [Citations.] Thus, if the employee 'inflicts an injury out of personal malice, not engendered by the employment' [citation] or acts out of 'personal malice unconnected with the employment' [citation], or if the misconduct is not an 'outgrowth' of the employment [citation], the employee is not acting within the scope of employment. Stated another way, '[i]f an employee's tort is personal in nature, mere presence at the place of employment and attendance to occupational duties prior or subsequent to the offense will not give rise to a cause of action against the employer under the doctrine of respondeat superior.' [Citation.] In such cases, the losses do not foreseeably result from the conduct of the employer's enterprise and so are not fairly attributable to the employer as a cost of doing business." (*Id.* at pp. 1004–1005.)

*Farmers, supra*, 11 Cal.4th 992, continued: "In a context more analogous to this case, several decisions have addressed whether an employee's sexual misconduct directed toward a third party is within the scope of employment for respondeat superior purposes. Those cases hold that, except where sexual misconduct by on-duty police officers against members of the public is involved [citations], the employer is not vicariously liable to the third party for such misconduct [citations to cases where a church was held not liable for repeated acts of sexual assault on a minor by a Sunday school teacher, an archbishop was not liable for priests' seduction of parishioner, and a school district was not liable for a janitor's rape of a student]. In those decisions,

vicarious liability was rejected as a matter of law because it could not be demonstrated that the various acts of sexual misconduct arose from the conduct of the respective enterprises. In particular, the acts had been undertaken solely for the employees' personal gratification and had no purpose connected to the employment. Moreover, the acts had not been engendered by events or conditions relating to any employment duties or tasks; nor had they been necessary to the employees' comfort, convenience, health, or welfare while at work."[11] (11 Cal.4th at pp. 1006–1007.)

Turning its attention to the facts before it, *Farmers, supra,* 11 Cal.4th 992, held the male deputy's conduct was outside the scope of employment as a matter of law. (*Id.* at p. 1007.) His conduct, although it took place at the workplace during work hours, was motivated by personal reasons unrelated to his job duties and was in direct violation of the employer's sexual harassment policy. (*Ibid.*) The Supreme Court rejected the argument that sexual harassment is foreseeable in any workplace. (*Id.* at p. 1008.) "While it is no doubt true that sexual harassment is a pervasive problem and that many workers in many different fields of employment have experienced some form of uninvited and unwanted sexual attention, this argument stretches the respondeat superior foreseeability concept beyond its logical limits. . . . [I]n determining whether a risk is 'unusual or startling' for respondeat superior purposes, ' "the inquiry should be whether the risk was one 'that may fairly be regarded as typical of or broadly incidental' *to the enterprise undertaken by the employer.*" ' [Citations.] Thus, it is not enough that a risk be neither unusual nor startling as a general matter; rather, the risk must be evaluated in the context of the employer's particular enterprise. [Citations.] . . . [E]vidence of the

---

[11] The California Supreme Court elsewhere said its analysis "does not rest on a mechanical application of a motivation-to-serve test for intentional torts, which would bar vicarious liability for virtually all sexual misconduct." (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 301 [48 Cal.Rptr.2d 510, 907 P.2d 358].) In holding a hospital was not vicariously liable for an ultrasound technician's sexual molestation of a patient during an ultrasound examination, *Lisa M.* said, "a sexual tort will not be considered engendered by the employment unless its motivating emotions were fairly attributable to work-related events or conditions. Here the opposite was true: a technician simply took advantage of solitude with a naïve patient to commit an assault for reasons unrelated to his work. [His] job was to perform a diagnostic examination and record the results. The task provided no occasion for a work-related dispute or any other work-related emotional involvement with the patient. The technician's decision to engage in conscious exploitation of the patient did not *arise out of* the performance of the examination, although the circumstances of the examination made it possible. 'If . . . the assault was not motivated or triggered off by anything in the employment activity but was the result of only propinquity and lust, there should be no liability.' (*Lyon v. Carey* (D.C. Cir. 1976) 533 F.2d 649, 655 [174 App. DC. 422].)" (*Lisa M., supra,* 12 Cal.4th at p. 301.) In the federal *Lyon* case, a deliveryman got into a dispute at a customer's home as to whether he would take a check rather than cash and whether he had to carry the goods upstairs. He then raped the woman customer and cut her. The federal appellate court held it was a jury question whether the trucking company was liable.

general prevalence of sexual harassment in workplaces and in newly integrated work environments has little, if any, probative value in determining whether lewd propositioning and offensive touchings of coworkers are typical of or broadly incidental to the particular enterprise here—a county jail." (*Id.* at p. 1009.)

The Supreme Court also said in *Farmers, supra*, 11 Cal.4th 992: "Even if the evidence shows that the use of profanity and sexually explicit language was not uncommon at this particular county jail, it still falls far short of establishing that serious misconduct such as asking individual employees for sexual favors and targeting those individuals for inappropriate touching is either typical of or broadly incidental to the operation of a county jail or to the duties and tasks of deputy sheriffs at such a jail. [Citations.] [¶] Moreover, factors that might be relevant to whether the County itself acted negligently are not relevant to whether the County should be vicariously liable for an employee's misconduct regardless of its own fault. [Citations.] Accordingly, even assuming arguendo that the usage of profanity and crude language at the jail should have put the County on notice that [the employee's] actions were 'foreseeable' in a negligence sense despite the absence of a causal link between the acts of sexual harassment and [his] work as a deputy sheriff, that is a matter lacking relevance in scope of employment analysis." (*Id.* at p. 1011.)

The Supreme Court also said that, although the male deputy was the supervisor of one of the females for part of the time in question, his power over her was in no way comparable to the extraordinary power police officers exercise over members of the public (in which context vicarious liability has been imposed). (*Farmers, supra*, 11 Cal.4th at pp. 1011–1012.) *Farmers* thus distinguished a case upon which plaintiff here relies heavily, *Mary M. v. City of Los Angeles, supra*, 54 Cal.3d 202, which held a public entity employer could be liable when an on-duty police officer used his authority to rape a citizen (if the jury so decided). *Farmers* said *Mary M.* emphasized police officers occupy a unique position of trust in our society and are given authority to detain, arrest, and use deadly force if necessary. (*Farmers, supra*, 11 Cal.4th at p. 1012.) When officers abuse their authority by committing crimes against members of the community, they violate the public trust and may erode the community's confidence in the integrity of its police force. (*Ibid.*) *Farmers* said, "Plainly there is no parallel between the supervisory authority in the instant case and the formidable, official authority at issue in *Mary M.*" (*Farmers, supra*, 11 Cal.4th at p. 1012.) *Farmers* added: "[F]or purposes of respondeat superior, employees do not act within the scope of employment when they abuse job-created authority over others for purely personal reasons." (*Id.* at p. 1013.)

Thus, we reject plaintiff's argument that *Mary M., supra,* 54 Cal.3d 202, supports her case on the basis that Damlahki's misconduct resulted from his misuse of his authority as her supervisor and project director.

*Farmers, supra,* 11 Cal.4th 992, considered whether imposing vicarious liability would further the three policy justifications for the respondeat superior doctrine: (1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury. (*Id.* at p. 1013.) *Farmers* found it significant that the FEHA already requires employers to take steps to prevent harassment and in some circumstances imposes direct liability on the employer. (*Farmers,* at pp. 1014, 1020.) Because the potential for direct liability under the FEHA already furnishes powerful motivation for the employer to maintain antiharassment policies, the imposition of vicarious liability was not essential to create a strong incentive for vigilance by those in a position to guard against the evil to be prevented. (*Farmers,* at p. 1015.) *Farmers* said the second justification (compensation of victims) was a neutral factor. (*Id.* at p. 1016.) The third factor (bearing of loss by those who benefit from the enterprise) did not justify imposing vicarious liability, because the male deputy exercised no job-conferred authority over the females during some of the misconduct, and even if the court were to consider only the misconduct that he committed as a supervisor, the case did not implicate the factors present in *Mary M., supra,* 54 Cal.3d 202, i.e., considerable authority and control inherent in the responsibilities of an officer enforcing the law, or the substantial benefits that the community derived therefrom. (*Farmers, supra,* 11 Cal.4th at p. 1017.) *Farmers* concluded consideration of the three respondeat superior policy justifications reinforced its determination that the male deputy's lewd propositioning and offensive touching of his trainee and coworkers were not within the scope of his employment. (*Ibid.*)

Applying *Farmers* to the case before us, we conclude Damlahki's sexual conduct towards plaintiff was outside the scope of employment as a matter of law, motivated by personal reasons unrelated to his job duties and in violation of the employer's sexual harassment policy. Even though plaintiff characterizes Damlahki's job as including mentoring of salespersons, which could lead to emotional relationships, Damlahki's sexual conduct toward plaintiff was not typical of or broadly incidental to Trendwest's enterprise of selling time-shares. We also consider the respondeat superior policy justifications: (1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury. As in *Farmers,* we consider it significant that Trendwest is already subject to strict liability under the FEHA for the conduct of Damlahki as

plaintiff's supervisor. Thus, common law liability is not needed to advance the respondeat superior policy justifications.

In her reply brief, plaintiff cites *Jacobus v. Krambo Corp.* (2000) 78 Cal.App.4th 1096 [93 Cal.Rptr.2d 425], an indemnification action, which held an employee sued by a coworker for sexual harassment was entitled to indemnification from his employer for the legal costs in successfully defending against the sexual harassment action. There, the test was whether the conduct defended against was within the course and scope of employment. (*Id.* at p. 1103.) In the underlying suit, the "harasser" conceded he discussed his sex life with the coworker, engaged in sexual bantering with her, and showed her sexually explicit materials. (*Id.* at p. 1102.) The First Appellate District held this conduct fell within the scope of employment, as it was simply part of the social intercourse that occasionally occurs in modern office settings. (*Id.* at pp. 1103–1106.) Social interactions among employees, including sharing of personal or private information, are broadly incidental to the employer's enterprise. The facts also suggested the coworker asserted her sexual harassment claim to deflect an adverse performance review, which the appellate court held was a risk inherent in employment. (*Ibid.*) However, plaintiff neglects to acknowledge the First Appellate District's statements that the jury in the underlying action answered "no" to the question whether Jacobus sexually harassed the coworker, and "in light of the verdict in the underlying action, Jacobus's conduct must necessarily be viewed as something other than sexual misconduct or sexual harassment. . . . In light of this verdict and what appears to be the entirely consensual interchange between Jacobus and [the coworker], [the First Appellate District] conclude[d] that the conduct of Jacobus was simply part of the social intercourse that occasionally occurs in modern office settings." (*Id.* at p. 1103.) Here, there is no jury finding that sexual harassment did not occur, and the evidence indicates nonconsensual sexual contact. *Jacobus* has no bearing on the case before us.

We conclude Trendwest is not liable for Damlahki's conduct under the common law counts of plaintiff's complaint.

Plaintiff argues *Farmers, supra,* 11 Cal.4th 992, is distinguishable because it did not involve misconduct by a supervisor. She is wrong, because *Farmers* discussed the fact that the male deputy supervised one of the female deputies during at least some of his misconduct. (*Id.* at pp. 998, 1001, 1017.)

Plaintiff also argues *Farmers, supra,* 11 Cal.4th 992, is distinguishable because in this case a triable issue exists as to whether the sexual battery and false imprisonment were foreseeable results or were engendered by or an outgrowth of the work at Trendwest. Plaintiff says Damlahki's declaration shows he worked closely with his employees in order to motivate them to

become successful salespersons, which was for everyone's economic benefit. His contact with employees after office hours was for this purpose. His management style of close relationships with salespersons was known to Trendwest. Plaintiff argues Damlahki's style of training and motivating his staff was likely to lead to the development of personal relationships. Plaintiff quotes from *Carr v. Wm. C. Crowell Co.* (1946) 28 Cal.2d 652 [171 P.2d 5]: "Such associations 'include the faults and derelictions of human beings as well as their virtues and obediences. Men do not discard their personal qualities when they go to work. Into the job they carry their intelligence, skill, habits of care and rectitude. Just as inevitably they take along also their tendencies to carelessness and camaraderie, as well as emotional makeup. In bringing men together, work brings these qualities together, causes frictions between them, creates occasions for lapses into carelessness, and for fun-making and emotional flareup. Work could not go on if men became automatons repressed in every natural expression. . . . These expressions of human nature are incidents inseparable from working together. They involve risks of injury and these risks are inherent in the working environment.' " (*Id.* at p. 656.) However, the conduct in *Carr* was one construction worker impulsively throwing a hammer at another worker when they got into a dispute about one's work interfering with the other's work. (*Id.* at p. 653.) *Carr* does not help plaintiff here.

As indicated, plaintiff argues Trendwest can be vicariously liable for Damlahki's misuse of his supervisory authority. Though not cited for this proposition in plaintiff's opening brief on appeal, we note that in *Capitol City Foods, Inc. v. Superior Court, supra,* 5 Cal.App.4th at pages 1049 through 1050, in discussing respondeat superior in an FEHA case, we observed the FEHC has applied common law agency principles to determine whether sexually harassing conduct was work related. We said: "Under common law agency principles, a principal is liable for the torts of his agent if the agent was aided in accomplishing the tort by the existence of the agency relationship. (Rest.2d Agency, § 219, subd. (2)(d) [see now Rest.3d Agency, §§ 7.03, 7.08[12]].) Under this theory of agency an employer may be liable when a supervisory employee uses the authority of his position to sexually harass an

---

[12] The Restatement Third of Agency says, "This Restatement does not include 'aiding in accomplishing' as a distinct basis for an employer's (or principal's) vicarious liability. The purposes likely intended to be met by the 'aided in accomplishing' basis are satisfied by a more fully elaborated treatment of apparent authority and by the duty of reasonable care that a principal owes to third parties with whom it interacts through employees and other agents." (Rest.3d Agency, § 7.08, com. b, p. 228.) The Restatement Third of Agency combines a principal's direct liability and vicarious liability in one provision, section 7.03, which says the principal is (1) directly liable when the agent acts with actual authority, but (2) vicariously liable when the agent acts with apparent authority or within the scope of employment. Section 7.08 of the Restatement Third of Agency says: "A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly

employee. [Citations.]" (*Capitol City Foods, supra,* 5 Cal.App.4th at p. 1049, fn. 2.) In *Capitol City Foods,* we said the plaintiff (who consented to date her supervisor) "did not allege the harassment was conditioning her job upon a demand for sexual favors." (*Id.* at p. 1049, fn. 2.)

Here, we see nothing indicating Damlahki conditioned plaintiff's job upon a demand for sexual favors. To the contrary, the trial court granted summary adjudication in favor of Trendwest on plaintiff's claim for quid pro quo harassment (which alleged that in December 2003 Damlahki offered to help plaintiff succeed at work in exchange for sexual favors), and plaintiff states on appeal that she does not challenge this ruling. The trial court noted the quid pro quo claim arose from an inference drawn by plaintiff without supporting evidence, and to the contrary, evidence showed Damlahki placed her on the coveted "owner referral board" even though her absences from work should have disqualified her. We recognize that plaintiff attested Damlahki exerted his authority over her by insisting on accompanying her on "driving for dollars," over her protests that it was unnecessary. However, she also admitted they had extensive work-related discussions during the drive, including his suggestions on how she could improve her group presentations. That Damlahki told plaintiff he wanted to show her something work-related at his house does not bring this case within respondeat superior liability.

We conclude the trial court properly granted summary adjudication in favor of Trendwest on the common law counts of plaintiff's complaint.

## V. *Punitive Damages*

Plaintiff argues the trial court erred in granting summary adjudication in favor of Trendwest on plaintiff's claim for punitive damages. We shall conclude Trendwest failed to establish entitlement to summary adjudication regarding punitive damages.

The complaint sought punitive damages for both the FEHA and the common law counts. Our affirmance of summary adjudication in favor of Trendwest regarding the common law counts defeats plaintiff's claim for punitive damages on those counts.

 However, the question remains of punitive damages on the FEHA counts. A court can award Civil Code section 3294 punitive damages in an FEHA case. (*Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 215 [185 Cal.Rptr. 270, 649 P.2d 912].) A party can

---

on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission."

move for summary adjudication of a claim for punitive damages under Civil Code section 3294 (Code Civ. Proc., § 437c, subd. (f)(1)), and Trendwest did so in this case.

Trendwest asserted in its motion that it was moving for summary adjudication of punitive damages on the ground that Damlahki was not Trendwest's managing agent. This was a reference to Civil Code section 3294, subdivision (b), which states: "An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation."

 Trendwest mistakenly reads this statute as stating that punitive damages cannot be awarded against a corporation for the conduct of an employee who is not a corporate officer, director, or managing agent. To the contrary, the statute says punitive damages cannot be awarded against a corporation for conduct of an employee unless a corporate officer, director, or managing agent had knowledge of the employee's unfitness and disregarded the rights of others (or authorized/ratified the conduct or committed the act of oppression).

In its separate statement of undisputed facts, on the issue of punitive damages, Trendwest merely repeated everything it asserted with regard to each count of the complaint. Trendwest submitted a declaration from its vice-president of human resources, Kent R. Keoppel, attesting Trendwest is a corporate employer, headquartered in Redmond, Washington, and is a wholly owned subsidiary of Cendant Timeshare Resort Group, which is headquartered in Orlando, Florida. Trendwest policies are formulated in Washington or Florida. Keoppel attested Damlahki was never an officer or director of Trendwest and had no control over or authority to make policy for Trendwest. Keoppel equated Damlahki's position to that of a retail store manager.

Plaintiff responded, "Undisputed but disputed as to the conclusion that Daml[ah]ki was the equivalent of a retail store manager." Plaintiff cited her own deposition testimony Damlahki told her that "corporate" told him not to go on a trip to Lake Tahoe with his subordinates, and he said he told them "fuck you," he was going to go anyway. Plaintiff also cited deposition

testimony of Marlene Martin, a former Trendwest project director, who said each project director "ran their own store," but they could not bend upper management's policies.

The trial court granted summary adjudication to Trendwest on the issue of punitive damages because "[i]n the absence of any wrongful conduct by Trendwest, plaintiff cannot be entitled to punitive damages."

Our reversal of the judgment necessarily invalidates the trial court's reasoning. At this point, it has not yet been determined whether Trendwest may be liable under the FEHA.

We can affirm a trial court's decision for reasons different from those of the trial court. (*Troche v. Daley* (1990) 217 Cal.App.3d 403, 407–408 [266 Cal.Rptr. 34].) However, we decline to do so in this case—not because a question exists as to whether Damlahki was a managing agent, but rather because Damlahki's status alone does not resolve the question of punitive damages.

 Thus, we agree with Trendwest that Damlahki was not a corporate officer, director, or managing agent within the meaning of Civil Code section 3294. The determination whether a supervisor is a "managing agent" within the meaning of Civil Code section 3294 " 'does not necessarily hinge on their "level" in the corporate hierarchy. Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy.' [Citation.]" (*Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 421 [27 Cal.Rptr.2d 457].) In *Kelly-Zurian*, the supervisor was the highest ranking person in the employer's Southern California offices and had immediate and direct control over the plaintiff, including the authority to terminate her employment. Nevertheless, he was not a managing agent within the meaning of Civil Code section 3294, because he did not have authority to change or establish business policy for the company's Southern California offices. Such policies were established by the corporate headquarters in St. Louis. (22 Cal.App.4th at pp. 421–422.) Thus, a supervisor must be in a corporate policymaking position in order to be considered a managing agent for purposes of imposing punitive damages liability on the employer.

Here, Trendwest presented evidence that Damlahki did not have policy-making authority, and plaintiff did not refute that evidence.

Plaintiff says in her reply brief she *did* dispute this point. She says there was evidence in this case that Damlahki was unfit as a project director, and his unfitness was brought to the attention of upper management. Plaintiff says

that, given this evidence, summary adjudication was patently erroneous. However, evidence that Damlahki was unfit as project director says nothing about whether he had policymaking authority.

On the other hand, knowledge by upper management that Damlahki was unfit might provide a basis for punitive damages under Civil Code section 3294, and this basis was not addressed in Trendwest's separate statement of facts concerning punitive damages.

We conclude Trendwest is not entitled to summary adjudication on the issue of punitive damages.

VI. *Attorney's Fees*

Since we reverse the trial court's summary adjudication of the FEHA counts, we will also reverse the trial court's award of FEHA attorney's fees to Trendwest under section 12965, subdivision (b).[13] Though not clear, it appears Trendwest may believe the award is nevertheless sustainable on the ground it was awarded for frivolous counts unchallenged by plaintiff on appeal. Thus, the trial court cited case law that the standard for awarding attorney's fees was whether the FEHA claims against Trendwest were frivolous, unreasonable, or without foundation. The court said that, although plaintiff did not prevail on count one (sexual harassment), the sexual harassment claim was not frivolous. However, said the court, the other three FEHA counts (failure to take reasonable steps, retaliation, and quid pro quo harassment) were frivolous. The trial court concluded most of Trendwest's attorney's fees would have been incurred in opposing the nonfrivolous sexual harassment count, and the court therefore awarded only $40,000, rather than the $125,000 requested by Trendwest.

Our reversal of summary adjudication of count two (failure to take reasonable steps) warrants reversal of the order awarding attorney's fees. In the absence of express argument on the point, we decline to consider whether section 12965, subdivision (b), should be construed to authorize an interim award of attorney's fees to Trendwest as prevailing party on a motion for summary adjudication of the two counts (retaliation and quid pro quo harassment) unchallenged by plaintiff on appeal.

---

[13] Section 12965, subdivision (b), authorizes FEHA actions and provides in part: "In actions brought under this section, the court, in its discretion, may award to the prevailing party reasonable attorney's·fees and costs, including expert witness fees, except where the action is filed by a public agency or a public official, acting in an official capacity."

## DISPOSITION

The judgment is reversed, and the case is remanded to the trial court with directions to enter an order (1) denying Trendwest's motion for summary adjudication of counts one and two (sexual harassment and failure to take steps to prevent harassment under the FEHA), (2) denying Trendwest's motion for summary adjudication of punitive damages alleged in count one (no punitive damages were alleged in count two), and (3) granting Trendwest's motion for summary adjudication of plaintiff's other counts (counts three through seven). The order awarding attorney's fees is reversed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.276(a)(4).)

Davis, J., and Cantil-Sakauye, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 13, 2007, S151599.