Filed 2/28/13  De La Cruz v. Cal-Pac Sonoma CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| SHANNEN DE LA CRUZ,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>CAL-PAC SONOMA, LLC et al.,<br><br>　　　　Defendants and Appellants. | A129889, A130141, A131134<br><br>(Sonoma County<br>Super. Ct. No. SCV244297) |

　　　Plaintiff Shannen De La Cruz sued defendants Cal-Pac Sonoma, LLC, dba The 101 Casino (Cal-Pac Sonoma) and Cal-Pac Group, Inc., dba The 101 Casino (Cal-Pac Group), for sexual harassment and retaliation arising out of her employment at The 101 Casino (the casino).  A jury found in plaintiff's favor and awarded her a total of $15,487 in economic damages, $500,000 in noneconomic damages, and $1,500,000 in punitive damages.  The trial court reduced the punitive damage award to $750,000, and awarded plaintiff $1,109,142 in attorney fees.  In their appeal, defendants contend the trial court erred in admitting the testimony of another worker at the casino, and that the noneconomic damages, punitive damages, and attorney fees awarded were excessive.  In her cross-appeal, plaintiff challenges the reduction in the punitive damage award.  We shall affirm the judgment and orders.

1

## I. BACKGROUND

### A. Evidence at Trial[1]

Plaintiff began to work at the casino as a card dealer in September 2004, working the morning shift. She had not had regular work for a year, and had sole responsibility for her young son. With her earnings, she could afford to send her son to preschool. Plaintiff was a proficient dealer, and was known for taking extra duties. A floor supervisor, Mabel Conti, testified that plaintiff was conscientious and fairly reliable. Conti never saw her act inappropriately with a customer and never wrote her up for misconduct.

It appears that at the time plaintiff worked at the casino, Cal-Pac Sonoma operated The 101 Casino, and that Cal-Pac Sonoma was a wholly owned subsidiary of Cal-Pac Group. After plaintiff stopped working for the casino, Cal-Pac Sonoma was acquired by new owners, and became separately owned and operated.

### 1. The Harassment

At Christmastime in 2004, one of the floor supervisors at the casino, Bill Bundensen, was giving out gift bags. He gave plaintiff a bag and told her, "I got you a candle . . . [T]his is my favorite smelling candle." He went on, "I want you to take it home and take a bubble bath and think of me." Plaintiff considered his remark inappropriate, but did not report it. Bundensen made similar suggestions over the next couple of weeks. When he asked plaintiff if she had taken a bath, she answered in the negative, and eventually told him she did not take baths and did not like candles. Bundensen did not mention the subject again.

In 2005, Bundensen began making inappropriate comments that appeared to refer to plaintiff's chest. The dealers carried their chips in trays called "racks." Once when

---

[1] Defendants' opening brief on appeal contains numerous factual assertions unsupported by citations to the appellate record, and for its recitation of the underlying facts relies heavily on the allegations of the complaint rather than the evidence introduced at trial. We remind defendants' counsel of their duty to provide adequate record citations. (Cal. Rules of Court, rule 8.204(a)(1)(C); see also *Bernard v. Hartford Fire Ins. Co.* (1991) 226 Cal.App.3d 1203, 1205.)

plaintiff asked Bundensen to help her get more chips for her rack, he looked at her and told her "[O]h, your rack looks good to me," while looking down at her. Once he told her, "[Y]our rack looks good today," although she did not have her tray of chips with her. He made similar comments sporadically over a period of months. Plaintiff was offended, and would tell him the comments were not funny, or that he was being rude and disgusting.

In his testimony, Bundensen denied the inappropriate behavior and comments about which plaintiff testified.

In approximately mid-2005, since Bundensen's inappropriate comments had not stopped, plaintiff reported to Maxanne McKinnie, the human resource manager at the casino, that Bundensen kept referring to her chest as a rack. She also told McKinnie about Bundensen's gift of the candle and his ensuing comments. She told McKinnie she wished to remain anonymous, but that Bundensen should be told to behave more professionally.

Plaintiff testified that McKinnie told her she was not the first person to complain. She also said that Bundensen was a friend of Randy Yaple, the general manager of the casino, that Yaple was aware of the complaints about Bundensen, and that no action had been taken after someone had previously complained about Bundensen. McKinnie promised to bring the matter to Yaple's attention. She later told plaintiff that Yaple was angry about the complaint, wanted to find out who had made it, and said he would check the security cameras to see who had visited McKinnie's office. Afterward, McKinnie gave plaintiff a "heads-up" that Yaple knew she was the person who had made the complaint. McKinnie also told plaintiff that Yaple was sexually harassing her.

McKinnie testified that she was concerned Yaple would retaliate if he knew of plaintiff's complaints. She was aware that Bundensen and Yaple were good friends. Yaple later told McKinnie he had looked at the security cameras to see if she and plaintiff were talking, and told her he "wanted to remind [her] . . . that he has eyes everywhere. He knows all and he sees all." He did not ask what the two were talking about, and she

3

did not tell him. McKinnie felt that her hands were tied in dealing with plaintiffs' complaints.

McKinnie testified that Yaple had harassed her by hugging her in a manner she found offensive, kissing her on the forehead, calling her at different hours throughout the night and on the weekends, suggesting they have dinner or go for a drink, and once telling her he wanted to go to her house and cuddle. McKinnie knew Yaple was married, and found his invitations inappropriate. He continued calling for several months, although she told him she was not interested. On two or three occasions, Yaple called McKinnie into his office when he was undressing, wearing only his underwear and a T-shirt, and tried to talk with her. Yaple would also share with McKinnie emails and pictures from a dating site. McKinnie told him his behavior was not welcome, and he stopped showing her the pictures and emails, but continued to do so with another employee, Nicole P. He also commented vulgarly to McKinnie about his sexual attraction to another woman.

### 2. *The Retaliation*

Bundensen became less friendly to plaintiff after she complained to McKinnie about his conduct. He stopped making the suggestive comments, but started "riding" her and "threatening [her] constantly." He would criticize plaintiff's work, sometimes for things she had not done, such as failing to "clear her hands," or show the security cameras that she did not have chips in her hand. When the casino was quiet in the morning, plaintiff would sometimes get a cup of coffee or read an article from the newspaper, as other dealers did, or help the other dealers with crossword puzzles. Bundensen told plaintiff not to do those things, although other dealers continued to do so. He once refused to allow plaintiff to leave the floor to use the restroom, and disciplined her by giving her a "write-up" when she did so, although the custom was that a dealer

could use the restroom after informing the supervisor.[2] He criticized her for being too friendly with the customers, and at times had a security guard stand by plaintiff's table as she was dealing, which she found intimidating and stressful. Bundensen changed the rotation in which the dealers worked at the tables in a way that reduced the amount of tips plaintiff received, either by having her work fewer tables, work for a shorter time at a table, or work games that generated lower tips.

As a result of Bundensen's actions, plaintiff experienced anxiety, lack of appetite, bad dreams, and difficulty sleeping. She lost weight, cried, and would throw up in the morning. In October 2005, plaintiff became sick and vomited on her way to work. She called the casino and spoke with Bundensen, who told her another dealer was available and she did not need to come to work. When she arrived at work the next day, Bundensen told her she should have reported to work before leaving, and wrote her up. Around early 2006, plaintiff saw her general practitioner because of her anxiety, difficulty sleeping, lack of appetite, and stress. She received a prescription for anti-anxiety medications. She was too embarrassed by the harassment, however, to tell her doctor what had happened to her at work.

After Bundensen criticized plaintiff for failing to clock out of work one day, plaintiff complained to Bill Marsden, the casino's director of gaming operations. At a meeting with Marsden and Bundensen, plaintiff told Marsden she had complained to Human Resources about Bundensen's sexual harassment, and that Bundensen's actions since then had been "pure harassment." Bundensen did not change his behavior after this meeting. Shortly afterward, he reached out to button the top button of a vest plaintiff was wearing. On the same day, Yaple put his arm around plaintiff, at her hip level, and pulled her to him. Once, after plaintiff's boyfriend had been in the casino, Bundensen told plaintiff that he had heard she "call[ed] [her boyfriend] good," a comment plaintiff found

---

[2] The other floor supervisor for the day shift, Conti, testified that before customers arrived in the morning, dealers sometimes read the newspaper or worked on crossword puzzles, and that she allowed the practice. Dealers were allowed to use the restroom while they were working.

5

offensive. One day as she was dealing at a table, Bundensen showed plaintiff a pen in the shape of a penis and asked her what she thought of when she saw it.

In April 2006, Bundensen wrote plaintiff up because of her attendance record. She had called in sick three times in April, two of those days with a doctor's note. The third day she was absent, she had an infection after a medical procedure she had undergone. Plaintiff was also disciplined for leaving early on several dates, although on most of those dates her supervisor had told her to leave early because there were more than enough dealers on the floor.

Plaintiff again spoke with Marsden in May 2006, when Bundensen wanted to write her up for dressing inappropriately. Marsden agreed with plaintiff that her clothes were appropriate.[3] Plaintiff told him again she was being harassed, and told him she had spoken with an attorney. She said, however, that she loved her job and did not want to file a claim.

Plaintiff asked McKinnie for a copy of her personnel file in preparation for filing a complaint with the Equal Employment Opportunity Commission (EEOC). In June 2006, in a meeting in which plaintiff and McKinnie were present, Marsden asked plaintiff if she had filed a complaint with the EEOC, and plaintiff said she had not. In early July 2006, Marsden fired plaintiff at the end of an uneventful work day.[4]

After plaintiff lost her job at the casino, she could no longer afford to send her son to preschool, and she lost her health insurance. She began working at another casino at the end of January 2007. However, she testified that she still felt the stigma of having

---

[3] McKinnie testified that plaintiff dressed appropriately for work, and that some of the other female dealers wore revealing clothing and did not receive disciplinary notices for their clothing. Conti testified that plaintiff's clothes were not inappropriate and that she never told plaintiff to wear something different.

[4] McKinnie had been fired approximately two weeks previously, after she told Yaple and the casino's acting human resources director that she planned to make a sexual harassment complaint against Yaple. In his testimony, Yaple denied knowing McKinnie was going to file a complaint against him when he decided to fire her.

been fired. Her commute to her new job was more difficult. She had to work the swing shift, which did not end until 4:00 in the morning, she did not get enough sleep, and she had to work with customers who had been drinking alcohol and were more obnoxious than those she had been accustomed to at The 101 Casino. Unlike The 101 Casino, the new casino allowed smoking, so she was exposed to secondhand smoke, and she believed she had become less marketable as a dealer because she was dealing fewer types of games at her new job.

### 3. Problems in Plaintiff's Personal Life

At the time she began working at The 101 Casino, plaintiff was involved in court proceedings related to a criminal action against her ex-husband, apparently as a result of an incident in which he tried to kill her and took her son hostage. It appears she had obtained a protective order against her ex-husband. She discussed the problems in her personal life with McKinnie, the casino's human resource manager, and she saw a clinical psychologist. Early in her employment, in 2004, plaintiff told McKinnie that she was taking anti-anxiety medication because she was upset over the problems in her personal life, and that she was having nightmares and not sleeping well. In early 2005, when telling McKinnie she would have to testify in court, plaintiff said she was an "emotional wreck," and that she was not sleeping due to nightmares. McKinnie noticed that plaintiff would become emotional on days she had to appear in court. In August 2005, plaintiff was upset because her former sister-in-law and two nephews had died in an airplane crash.

### 4. Testimony by Other Employees

#### a. Adriana C.

On direct examination by plaintiff's counsel, Adriana C. testified that she began working as a dealer at the casino in 2004. On a few occasions, while she was dealing, Bundensen stared at her breasts and said, "can I have your rack[?]" or "I like your rack." He would also hold a pen by his pelvic area, open and close it, and make suggestive comments. His actions made her feel "dirty" and "uncomfortable." On a few occasions, he tried to hug her from behind and kiss her on the cheek. He got her cell phone number,

7

and on five or six occasions called or texted her to invite her to have a drink with him, although she did not respond to his invitations. He was her supervisor, and she felt intimidated, so she never complained.

On cross-examination, defense counsel asked Adriana C. whether she had been fired in February 2009. She replied, "Yeah, I got fired after I got raped." In response to further cross-examination, she testified that in February 2009, she went out drinking with other employees from the casino after work. At the end of the evening, while she was in a motel room with two of the employees, a man and a woman, she was raped. The next day, she told her supervisor she had been raped, but did not say other casino employees were involved. He told her to go to the police. The following day, Adriana C. told her supervisor two casino employees were involved in the rape. Her supervisor told her he could not help her because the incident had happened outside of work. Adriana C. then reported the matter to the police department. No charges were filed, and the other employees denied that a rape had taken place. Adriana C. was fired a few days after she reported the incident.[5] It appears from the record that Adriana C. became emotional during her testimony.

### b. Marilyn Motil

Marilyn Motil testified that she started working at the casino in June 2006. She became human resource manager. After plaintiff was fired, Yaple told her that plaintiff had made a complaint against Bundensen and that plaintiff was a "shit disturber."

## B. The Verdicts and Post-Trial Rulings

The jury found defendants liable for sexual harassment and retaliation. As damages for sexual harassment, the jury awarded against each defendant $50,000 in past noneconomic loss and $50,000 in future noneconomic loss. For the retaliation, the jury awarded against each defendant $7,743.50 in past economic loss, $87,500 in past noneconomic loss, and $62,500 in future noneconomic loss. Thus, the total award was

---

[5] Adriana C. later sued the casino for wrongful termination and sexual harassment, represented by plaintiff's counsel.

$15,487 in economic damages and $500,000 in noneconomic damages. The jury found, by clear and convincing evidence, that an officer, director, or managing agent of each defendant had committed, authorized, or ratified an act of malice, oppression or fraud, and awarded punitive damages of $500,000 against Cal-Pac Sonoma, LLC and $1,000,000 against Cal-Pac Group, Inc.

Defendants moved for judgment notwithstanding the verdict and for a new trial. The trial court denied the motion for JNOV. As to the motion for new trial, the court ruled the amount of punitive damages was excessive in comparison with the harm plaintiff suffered. In doing so, it noted that punitive damages should punish defendants for harm done to plaintiff, not to other female employees, such as McKinnie and Adriana C., and found that "relevant evidence provided by non-party female employees probably inflated the amount of punitive damages." The court concluded a reasonable punitive damage award would be half the amount the jury awarded, or a total punitive damage award of $750,000. The court ruled that if plaintiff did not accept the remittitur of the punitive damage award, a new trial would be granted as to punitive damages only. Plaintiff accepted the remittitur.

Plaintiff moved for statutory attorney fees under the Fair Employment and Housing Act (FEHA). (Gov. Code, § 12965, subd. (b).) The trial court awarded lodestar fees of $739,428, and a 1.5 multiplier, for a total fee award of $1,109,142.

Defendants have appealed the judgment after the jury trial (A129889), the denial of their motion for new trial and motion for JNOV (A130141), and the award of attorney fees (A131134). Plaintiff has cross-appealed the order reducing the punitive damage award. These appeals have been consolidated.

## II. DISCUSSION

### A. Admissibility of Adriana C.'s Testimony

Defendants contend the trial court abused its discretion in allowing Adriana C. to testify over their objection, arguing that her testimony that she was raped and then fired from the casino was inadmissible and was improperly used to inflame the jury. We

9

review a ruling on the admissibility of evidence for abuse of discretion. (*Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 516 (*Beyda*).)

Defendants argue, first, that Adriana C.'s testimony was impermissible propensity evidence. (See *Beyda*, *supra*, 65 Cal.App.4th at p. 518; Evid. Code, § 1101, subd. (a).) However, testimony about the harassment of other employees, sometimes referred to as "me-too" evidence, although inadmissible to show propensity, may be admissible for other purposes, such as to show a defendant's intent. (See *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 114 (*Pantoja*); *Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 759, 767; Evid. Code, § 1101, subd. (b).) As explained in *Pantoja*: "[The plaintiff's] claim of hostile environment harassment required her to show a discriminatory intent on [the defendant's] part. A claim for hostile environment sexual harassment exists under the FEHA where the plaintiff was subjected to unwelcome conduct or comments because of his or her sex and the result was harassment so severe or pervasive that the conditions of the plaintiff's employment were altered. . . . In every case, [] the plaintiff must show a discriminatory intent or motivation based on gender. It follows that if the me-too evidence was probative of [the defendant's] intent in behaving as [the plaintiff] alleged, tending to show that gender bias motivated the alleged unwanted touching, shouting, and epithets, then that evidence was admissible under [Evidence Code] section 1101, subdivision (b). It was not made inadmissible under [Evidence Code] section 1101, subdivision (a), assuming it was not substantially more prejudicial than probative under Evidence Code section 352."[6] (*Pantoja*, *supra*, 198 Cal.App.4th at p. 114.)

Defendants argue that this rule is inapplicable here because evidence of harassment of other employees is admissible to show hostile work environment only if

---

[6] Defendants argue that this rule applies only to claims of discrimination, not harassment. *Pantoja* specifically concluded the rule applied in the discrimination context in *Johnson* was also applicable to claims of hostile environment harassment. (*Pantoja*, *supra*, 198 Cal.App.4th at p. 114; see also *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 279–280 [disparate treatment of employee based on sex is essence of sexual harassment claim].)

10

the plaintiff had personal knowledge of the harassment. For this proposition, they rely on *Beyda*, *supra*, 65 Cal.App.4th 511. The court in *Pantoja* rejected this argument, noting that *Beyda* stood for the proposition that evidence of sexual harassment of other employees, unknown to the plaintiff, is not admissible to prove a defendant's propensity to harass. (*Pantoja*, *supra*, 198 Cal.App.4th at p. 111, citing *Beyda*, *supra*, 65 Cal.App.4th at p. 515.) As the court in *Pantoja* explained, however, "*Beyda* does not address the issue of when this type of evidence is admissible to prove intent or the other matters listed in section 1101, subdivision (b)," as the plaintiff there did not make that argument. (*Pantoja*, *supra*, 198 Cal.App.4th at p. 111.) Here, under the rule of *Pantoja*, Adriana C.'s testimony about similar incidents was admissible to show Bundensen's intent in his behavior toward plaintiff, particularly in making comments about a "rack" and using a pen in a suggestive manner.

Defendants contend, however, that Adriana C.'s testimony was inflammatory and therefore inadmissible under Evidence Code section 352. Plaintiff's counsel did not ask Adriana C. about her dismissal or the surrounding circumstances, instead confining the brief direct examination to Bundensen's sexual harassment, including commenting on her "rack," using a pen in a suggestive manner, and hugging, kissing, and calling her. *Defendants*, not plaintiff, elicited the testimony about the circumstances surrounding Adriana C.'s dismissal, including her testimony that she was fired after reporting being raped by another employee. Defendants argue they had to attack Adriana C.'s credibility and show her bias by eliciting testimony about her termination and the fact that she had sued the casino, and contend that the attorneys and trial court "all knew what would happen if [Adriana C.] was permitted to testify." Defendants have not shown, however, that they informed the trial court that Adriana C. claimed she had been fired for reporting a rape; in fact, at the hearing on the motion for a new trial, the court indicated that it was not aware of the risk that Adriana C. would testify about the rape. Nor did defendants move to strike Adriana C.'s testimony that she had been raped, instead choosing to question her in detail about her claims. In the circumstances, we see no abuse of discretion in the trial court's rulings.

11

**B. Noneconomic Damages**

Defendants contend there was no substantial evidence to support the award of $500,000 in noneconomic damages. They argue that (1) plaintiff's emotional distress was caused in large part by her family problems; (2) plaintiff sought medical attention for anxiety only twice during her time at the casino and the notes McKinnie took of her conversations with plaintiff do not show that plaintiff complained of many of the instances of sexual harassment; and (3) the award of future noneconomic damages was unsupported because plaintiff began working at another casino approximately six months after being fired and was not treated for depression or anxiety after being fired.

In reviewing a claim of excessive damages, we bear in mind that " '[t]he amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses . . . . As a result, all presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.' " (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 820–821 (*Iwekaogwu*).)

If a claim of excessive or inadequate damages turns on the credibility of witnesses, conflicting evidence, or other factual questions, it may be raised on appeal only if the appellant first raised it in a motion for new trial in the trial court. (*Jamison v. Jamison* (2008) 164 Cal.App.4th 714, 719–720; *County of Los Angeles v. Southern Cal. Edison Co.* (2003) 112 Cal.App.4th 1108, 1121.) Within specified time periods, a party intending to move for a new trial must file and serve "a notice of his or her intention to move for a new trial, designating the grounds upon which the motion will be made and whether the same will be made upon affidavits or the minutes of the court." (Code. Civ.

Proc.,[7] § 659.)  Motions for new trial on certain grounds, including excessive or inadequate damages, insufficiency of the evidence to justify the verdict, and error in law at trial, must be supported by the minutes of the court.  (§ 658.)

Defendants' notice of motion for new trial stated that they "will and hereby do move this Court for an order granting Motion for New Tria[l] pursuant to Code of Civil Procedure section 657.1,"[8] and that the motion was based on, among other things, the attached memorandum of points and authorities, and the pleadings, papers, records, and documentary materials in the case.  The accompanying memorandum of points and authorities argued that a new trial should be granted because the trial court made erroneous evidentiary rulings and the evidence was insufficient to support the emotional distress or punitive damage awards.

Plaintiff argued in the trial court that defendants' motion was defective because defendants did not provide the court's minutes to support their claims of excessive damages, as required by section 658.[9]  In ruling on defendants' claims regarding noneconomic damages, the trial court agreed that defendants' claims of legal error and

---

[7]All undesignated statutory references are to the Code of Civil Procedure.

[8] It appears that defendants intended to refer to section 657, paragraph 1.  In its order on the new trial motion, the trial court noted the discrepancy but concluded that because the memorandum of points and authorities in support of the motion referred to section 657 and four grounds set forth in that statute, the court would not ignore the motion on a theory of inadequate notice.  This ruling was proper.  (See *Collins v. Sutter Memorial Hospital* (2011) 196 Cal.App.4th 1, 17–22 [no basis to reverse new trial order because it relied on ground not stated in notice of intent to move for new trial; although notice of intent specified wrong ground, moving party apprised other party of correct ground in memorandum of points and authorities]; *McFarland v. Kelly* (1963) 220 Cal.App.2d 585, 589 (*McFarland*) [notice of intent to move for new trial and contemporaneous memorandum in support of motion treated as one pleading that, construed together, showed grounds upon which moving party intended to move for new trial].)

[9] "The 'minutes of the court' include the records of the proceedings entered by the judge or courtroom clerk showing what action was taken and the date it was taken (Gov. Code, § 69844) and may also include depositions and exhibits admitted into evidence and the trial transcript.  (§ 600.)" (*Lauren H. v. Kannappan* (2002) 96 Cal.App.4th 834, 839, fn. 4.)

13

insufficiency of the evidence were procedurally barred, and concluded that even if it had the power to decide this issue, it would not grant a new trial. Inexplicably, in their appellate briefing defendants completely ignore the procedural ground upon which the trial court denied their motion for a new trial as to the question of noneconomic damages. Any challenge to this procedural basis for the court's ruling is therefore waived. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785; *Horowitz v. Noble* (1978) 79 Cal.App.3d 120, 139.)

Defendants have also arguably waived their challenge to the sufficiency of the evidence to support the noneconomic damage award by failing to set forth *all* of the evidence relevant to plaintiff's emotional distress. The "Statement of Facts" in their opening brief includes only (1) a brief discussion of the corporate defendants and the casino; (2) a summary of the allegations in the complaint; (3) a discussion of notes McKinnie took of her conversations with plaintiff in which plaintiff told her of the stress she was experiencing due to the problems in her personal life; and (4) a summary, devoid of citations to the record, of plaintiff's complaints about harassment and the termination of her employment. In the portion of their briefs on appeal addressing the emotional distress issue, defendants rely entirely on the statements in McKinnie's notes and on plaintiff's testimony about her mental health treatment and her new job, and ignore the evidence plaintiff introduced at trial to support her claim of emotional distress. As explained in *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 (*Nwosu*), "an attack on the evidence without a fair statement of the evidence is entitled to no consideration when it is apparent that a substantial amount of evidence was received on behalf of the respondent. [Citation.] Thus, appellants who challenge the decision of the trial court based upon the absence of substantial evidence to support it ' "are required to set forth in their brief *all* the material evidence on the point *and not merely their own evidence*. Unless this is done the error is deemed waived." ' "

In any case, we see no basis to reverse the award of noneconomic damages. There is evidence that, by the end of 2004, plaintiff became subjected to a pattern of sexual harassment; that she was concerned about retaliation if Yaple found out she had

14

complained of the harassment; that after she spoke to McKinnie she was subjected to persistent retaliation; that as a result she suffered anxiety, bad dreams, sleeplessness, lack of appetite, nausea, weight loss, and crying spells; that she went through a period of unemployment after being fired; that even after finding a new job, she felt the stigma of having been fired; and that she had a more difficult commute, a more difficult schedule, and less favorable working conditions at her new job. In light of this evidence, we cannot conclude the award of noneconomic damages was the result of passion or prejudice. (See *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 997, disapproved on another ground in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664 [award of $662,00 for emotional distress in sexual harassment case reasonable and well within range of awards in similar cases]; *Iwekaogwu*, *supra*, 75 Cal.App.4th at p. 821 [award of approximately $450,000 in noneconomic damages for race discrimination, hostile work environment, and retaliation not excessive].)

## C. Punitive Damages

### 1. *Procedural Issues on Appeal and Cross-Appeal*

Defendants challenge the award of punitive damages, contending the evidence does not show either corporate entity is liable for punitive damages and that, in any case, the award was excessive. In their cross-appeal, plaintiff contends the trial court acted improperly in reducing the punitive damage award.[10] In connection with both defendants' appeal and her own cross-appeal, plaintiff argues defendant's motion for new

---

[10] Although a plaintiff who consents to a remittitur may ordinarily not appeal on any unseverable issue, the plaintiff may do so on *cross-appeal* if the defendant appeals the judgment, thereby depriving the plaintiff of the benefits she sought by consenting to the remittitur. (*Miller v. National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 341–345; see also *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 918, fn. 1 (*Neal*); *Collins v. Union Pacific Railroad Co.* (2012) 207 Cal.App.4th 867, 882 (*Collins*).)

trial was procedurally defective and the trial court therefore lacked jurisdiction to rule on it.[11]

In support of her argument, plaintiff points out, first, that defendants did not file a separate document entitled "notice of intention to move for new trial," but instead filed a "Notice of Motion and Motion for New Trial," and that the hearing on the motion took place on a later date than that specified in the notice. As we have explained, section 659 requires a party to file and serve a "notice of his or her intention to move for a new trial." Plaintiff provides no authority for her apparent assertion that the lack of the word "intention" in the pleadings deprived the court of jurisdiction over the matter, or that she lacked notice of the motion or of the date of the hearing that ultimately took place. (See *McFarland*, *supra*, 220 Cal.App.2d at pp. 589–590 [despite minor technical defect in notice, court has jurisdiction to rule on motion for new trial where adverse party has been given due notice that motion will be made and is apprised of grounds to be considered].) We reject this contention.

Nor are we persuaded by plaintiff's argument that the trial court lacked jurisdiction to rule on the new trial motion because defendants did not file minutes of the court.[12] The court in *Nichols v. Hast* (1965) 62 Cal.2d 598, 600, considered and rejected a contention that a trial court lacked jurisdiction to grant a motion for new trial where the notice of intention did not state that it would be made on the minutes of the court, ruling "*[t]he court may consider its own minutes when ruling on a motion for a new trial*

---

[11] Defendants ignore this argument in their respondents' brief for the cross-appeal. However, the judgment is presumed correct (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956), and it remains plaintiff's burden in her cross-appeal to show prejudicial error (see *In re Marriage of Schultz* (1980) 105 Cal.App.3d 846, 853 [where no respondent's brief filed, appellate court examines record on basis of appellant's brief and reverses only if prejudicial error found]; accord, *Votaw Precision Tool Co. v. Air Canada* (1976) 60 Cal.App.3d 52, 55).

[12] At the hearing on the motion for new trial, the trial court directed the clerk to provide a certified copy of the minute sheets for the two verdict dates, and made them court exhibits to the motion. In doing so, the court expressed uncertainty as to whether such a procedure was authorized, but said it would do further research before ruling on the motion.

16

*[citation], since it may take judicial notice of such records*. [Citations.] The purpose of notice under section 659 is to give the adverse party a reasonable opportunity to oppose a motion for a new trial on its merits. In the present case, defendant had such opportunity, for plaintiffs' notice clearly stated that the motion would be made on the ground that the evidence was insufficient to justify the verdicts. Unlike a notice that a motion for a new trial will be made on grounds specified therein [citations], *further notice that it will be made on affidavits or the minutes of the court is not jurisdictional . . . .* Therefore, 'when the adverse party has been given due notice that . . . a motion [for a new trial] will be made and is fully apprised of the grounds to be urged the jurisdiction of the court is complete.' [Citations.]" (Italics added.) Similarly here, the trial court could properly consider its own minutes, and did not lack jurisdiction to consider the motion although defendants did not provide copies of the minutes.

In arguing that the trial court lacked jurisdiction to rule on the new trial motion, plaintiff points out—as we have already discussed—that in denying the motion as to *noneconomic* damages, the trial court concluded the motion was procedurally barred by defendants' failure to provide court minutes; without explanation, the court then went on to consider and grant the motion as to *punitive* damages despite the lack of court minutes. We acknowledge this apparent contradiction. However, as we have explained, defendants waived any challenge to the trial court's procedural ruling denying their motion as to noneconomic damages, and we therefore have no occasion to decide the propriety of that portion of the ruling.

    2.  *Defendants' Liability for Punitive Damages*

        a.  Managing Agent

Defendants contend the evidence is insufficient to support the jury's findings that an officer, director, or managing agent of each of defendants committed, authorized, or ratified an act of malice, oppression, or fraud.

Civil Code section 3294, subdivision (b) provides that a corporate employer is not liable for punitive damages based upon an employee's actions unless an officer, director, or managing agent of the corporation had advance notice of the unfitness of the employee

17

and employed him or her with a conscious disregard of the rights and safety of others, authorized or ratified the wrongful conduct at issue, or was guilty of oppression, fraud, or malice. Our Supreme Court has interpreted this to mean that "principal liability for punitive damages [does] not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy. Thus, supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents. Conversely, supervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees. In order to demonstrate that an employee is a true managing agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 576–577 (*White*); see also *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 714; *Myers v. Trendwest Resorts, Inc.* (2007) 148 Cal.App.4th 1403, 1437 [to be considered managing agent, supervisor must have corporate policymaking authority].) In *White*, the court concluded that a zone manager who was responsible for managing eight stores and at least 65 employees, to whom most or all of the responsibility for running the stores was delegated, to whom individual store managers reported, and who reported to department heads in the corporation's retail management department, was a managing agent for purposes of Civil Code section 3294, subdivision (b). (*White*, *supra*, 21 Cal.4th at p. 577.)

There was evidence that both Marsden and Yaple knew of plaintiff's complaints about Bundensen's harassment and retaliation, that Yaple participated in the harassment by putting his arm around her, at hip level, and pulling her to him after she complained of harassment, and that Marsden fired her. On the question of whether Yaple and Marsden were managing agents of the casino, plaintiff presented evidence that Yaple was the casino's general manager, that he and Human Resources were responsible for enforcing the casino's sexual harassment policy, and that he handled most disciplinary issues.

18

Yaple signed a memorandum to casino employees amending the employee handbook and establishing new policies and disciplinary procedures for badge use, tardiness, forgetting to clock into work, requesting time off, and handling items customers left behind. The memorandum stated that if employees had concerns, the chain of command was (1) the supervisor; (2) the manager; (3) Human Resources, and (4) the general manager, i.e., Yaple. Marsden was the director of gaming operations, and reported to Yaple. He supervised a staff of about 70 people, including several supervisors. His job duties included responsibility for all divisions of the casino when other managers were not present, overseeing hiring and training of all casino employees, writing employee job descriptions and conducting performance reviews, writing and implementing gaming rules and new casino games and procedures, and structuring and implementing tournaments. He wrote a memorandum to casino floor staff about his authority over casino gaming policy, in which he stated, "If I make a policy or a decision you are to follow my direction without fail until you are told differently by me or Randy Yaple, the General Manager." This evidence is sufficient to support a conclusion that Yaple and Marsden "exercised substantial discretionary authority over significant aspects of [defendants'] business." (*White*, *supra*, 21 Cal.4th at p. 577.)

### b. Cal-Pac Group's Financial Condition

Defendants contend plaintiff was not entitled to punitive damages against Cal-Pac Group because plaintiff failed to submit evidence of Cal-Pac Group's financial condition. Their argument, however, is not supported by even a single citation to the relevant portions of the record. "[I]t is counsel's duty to point out portions of the record that support the position taken on appeal. The appellate court is not required to search the record on its own seeking error." (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 (*Del Real*); see also *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1140–1141.) Accordingly, we shall treat this issue as waived. (*Del*

19

*Real*, *supra*, 95 Cal.App.4th at p. 768; see also *Nwosu*, *supra*, 122 Cal.App.4th at p. 1246; *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 (*Guthrey*).)[13]

        c.   Award Against Cal-Pac Sonoma

Defendants also contend punitive damages were not properly awarded against Cal-Pac Sonoma because it did not own the casino while plaintiff worked there. Accordingly, they argue, such an award would not serve the purposes of punitive damages, which are to punish wrongdoers and deter the commission of wrongful acts. (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1689 (*Boeken*).) We reject this contention. The evidence shows that Cal-Pac Group was a holding company, that at the time of the events at issue here it owned "Cal-Pac Sonoma, DBA the 101 Casino," and that Yaple worked for Cal-Pac Sonoma. There is also evidence to support the conclusion that plaintiff was employed by both Cal-Pac Sonoma and Cal-Pac Group: Cal-Pac Sonoma operated the casino. Plaintiff's W-2 form for 2006 was issued by Cal-Pac Sonoma. Her December 2006 performance evaluation came from Cal-Pac Group, as did the notice of her termination. In the circumstances, defendants have not met their burden to show that an award of punitive damages against Cal-Pac Sonoma was improper.

---

[13] The jury was instructed that the court had ordered Cal-Pac Group to produce a witness to its financial condition and certain financial records so the jury could evaluate whether any particular punitive damage award would have a deterrent effect without being unduly burdensome; that Cal-Pac Group may have violated this order by failing to produce the witness to authenticate certain documents and testify as to Cal-Pac Group's net worth and by failing to produce the documents; that the jury could infer from Cal-Pac Group's failure to produce the witness and documents that the evidence would have been unfavorable to Cal-Pac Group; and that the jury could therefore award punitive damages against Cal-Pac Group in any amount it deemed appropriate. Defendants make unsupported assertions about the circumstances surrounding the witness's failure to appear at trial, but do not challenge the propriety of this instruction on appeal.

20

*3. Amount of Punitive Damage Award—Appeal and Cross-Appeal*

Defendants contend that the punitive damage award—even after the remittitur—was excessive. They argue that the jury became biased against defendants after hearing Adriana C.'s story of being raped, that the facts show a low level of reprehensibility because their conduct caused "only minor economic harm to Plaintiff and no physical harm," and that the plaintiff was already made whole by the compensatory damage and attorney fee awards. For her part, plaintiff argues in her cross-appeal that the trial court invaded the province of the jury and acted improperly in reducing the jury's original punitive damage award of $1,500,000.

We will address the cross-appeal first. Plaintiff contends that the issue before us is whether the *jury's award* of punitive damages exceeded constitutional limits. She argues that we should exercise our independent judgment on that question and, if we conclude the original jury award fell within constitutional limits, reinstate that award. (See *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1201 [court reviewing award of punitive damages for constitutionality makes independent assessment of relationship between award and factual circumstances of case].)

Plaintiff's argument is unconvincing because, on appeal, we review not the original jury award, but the *trial court's ruling* on the motion for a new trial. In ruling on such a motion, the trial court sits "as a 'thirteenth juror.' " (*Boeken*, *supra*, 127 Cal.App.4th at p. 1689.) The trial court is " 'in a far better position than an appellate court to determine whether a damage award was influenced by "passion or prejudice" ' " and " 'is vested with the power, denied to us, to weigh the evidence and resolve issues of credibility. [Citation.]' [Citation.]" (*Ibid.*) In *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 821–824 (*Grimshaw*), the court considered a case, like this, in which the cross-appellant consented to a remittitur after the trial court conditionally granted a new trial on the issue of punitive damages. The court explained the legal standard as follows: "In ruling on a motion for new trial for excessive damages, the trial court does not sit 'in an appellate capacity but as an independent trier of fact.' [Citation.] This role as a fact finder is conferred on the trial court by Code of Civil Procedure section 662.5 which

21

provides that if a new trial limited to the issue of damages would be proper after a jury trial, 'the trial court may in its discretion: . . . (b) if the ground for granting a new trial is excessive damages, make its order granting the new trial subject to the condition that the motion for a new trial is denied if the party in whose favor the verdict has been rendered consents to a reduction of so much thereof as the court *in its independent judgment determines from the evidence to be fair and reasonable*.' (Italics supplied.) In addition, Code of Civil Procedure section 657 provides that an order granting a new trial for excessive damages shall be reversed 'only if there is no substantial basis in the record for' the reasons stated in the judge's specification of reasons. An appellate court may reverse the order granting the new trial only when the reasons given by the trial judge reflect a manifest and unmistakable abuse of discretion. [Citations.]"[14] (*Id*. at p. 823.)

Therefore, " '[w]here the trial court has required a remission as a condition to denying a new trial "a verdict is reviewed on appeal as if it had been returned in the first instance by the jury in the reduced amount." [Citations.]' [Citation.]" (*West v. Johnson & Johnson Products, Inc*. (1985) 174 Cal.App.3d 831, 877 (*West*).) Such an order will not be reversed unless it plainly appears that the trial court abused its discretion (*Gerard v. Ross* (1988) 204 Cal.App.3d 968, 978 (*Gerard*)), and "the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of

---

[14] Section 662.5 has since been amended; the pertinent portion, subdivision (a)(2), now provides that in a civil action where an order granting a new trial on the issue of damages would be proper, the trial court may, in its discretion, "[i]f the ground for granting a new trial is excessive damages, issue a conditional order granting the new trial unless the party in whose favor the verdict has been rendered consents to the reduction of so much thereof as the court in its independent judgment determines from the evidence to be fair and reasonable."

the order." (*Neal*, *supra*, 21 Cal.3d at p. 932); see also *Collins*, *supra*, 207 Cal.App.4th at p. 882.)[15]

In ruling on the motion for new trial, the trial court found that, "[w]hile the trial evidence absolutely supports a jury finding that the defendants engaged in prolonged, reprehensible conduct justifying an award of punitive damages, the jury nonetheless chose an amount of punitive damages that is excessive; there is too great of a disparity between the harm suffered and the size of the award." Moreover, the trial court concluded, "[b]ecause of the inherent likelihood of overlap between [emotional distress] compensation and exemplary damages, the jury should have returned a punitive damage award more reasonably proportionate to the compensatory damages (an amount equal to, or not too far in excess of, the compensatory figure). An award in this ballpark would be much more consistent with the authorized focus of such a punitive finding: to punish the two defendants for harm done to the plaintiff as opposed to harm done to other female employees (e.g., to Maxann[e] McKinnie and Adriana [C.]). The court finds that relevant evidence provided by non-party female employees probably inflated the amount of punitive damages." The court then found that the reduced punitive damage award "would be sufficient to punish the malicious workplace behavior and to deter future sexual harassment and retaliation for complaints of the same."[16]

---

[15] A trial court's specification of its reasons for concluding the jury's punitive damage award is adequate if it "makes reference to those aspects of the trial proceedings which, in the trial court's view, improperly led the jury to inflate its award." (*Neal*, *supra*, 21 Cal.3d at p. 932.)

[16] Plaintiff points out correctly that an appellate court "review[s] the record for substantial evidence of circumstances warranting the imposition of punitive damages" (*Patrick v. Maryland Casualty Co.* (1990) 217 Cal.App.3d 1566, 1576), and argues that we should likewise review for substantial evidence the trial court's finding that the punitive damage award was inflated by the other employees' evidence. We are not persuaded that we should abandon the normal rule that in reviewing a trial court's remittitur, we review the verdict as if it had been returned in the first instance and reverse only if an abuse of discretion plainly appears. (*West*, *supra*, 174 Cal.App.3d at p. 877; *Gerard*, *supra*, 204 Cal.App.3d at p. 978; *Grimshaw*, *supra*, 119 Cal.App.3d at p. 824.)

We see no abuse of discretion in the trial court's conclusion that a total punitive damage award of $750,000—reflecting a ratio of just under one and a half times the compensatory damage award—was sufficient to serve the purposes of punishment and deterrence. Excessive punitive damage awards may offend the due process clause of the United States Constitution. (*State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 425 (*State Farm*).) Multipliers in the single digits are more likely than larger multipliers to satisfy due process, while still serving the goals of deterrence and retribution. (*Romo v. Ford Motor Co.* (2003) 113 Cal.App.4th 738, 751 (*Romo*), citing *State Farm*, *supra*, 538 U.S. at p. 425.) In assessing a punitive damage award, courts may consider the nature of the defendant's acts, the amount of the compensatory damage award, and the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. (*Johnson v. Ford Motor Co.*, *supra*, 35 Cal.4th at p. 1201.) A higher single-digit multiplier may be appropriate where it is difficult to set noneconomic damages. (*Romo*, *supra*, 113 Cal.App.4th at p. 752, citing *State Farm*, *supra*, 538 U.S. at p. 425.) However, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (*State Farm*, *supra*, 538 U.S. at p. 425.)

The trial court concluded defendants engaged in "prolonged, reprehensible conduct," and the evidence supports this conclusion. However, as the trial court also noted, the award of $500,000 for emotional distress was substantial, and the trial court could reasonably conclude defendant was fully compensated for her emotional distress through that award.[17] Moreover, the trial court was in a better position than an appellate

---

[17] After concluding that the original jury award of punitive damages was excessive and concluding that a total punitive damage award of $750,000 would be sufficient to punish and deter, and trial court noted that plaintiff would be statutorily entitled to attorney fees. Plaintiff contends that the trial court should not have relied on the availability of attorney fees in setting punitive damages. We see no impropriety in the trial court's reasoning. (See *Walker v. Farmers Ins. Exchange* (2007) 153 Cal.App.4th

24

court to determine whether the jury was likely influenced by passion, prejudice, or other improper factors in setting the punitive damage award. (See *Boeken*, *supra*, 127 Cal.App.4th at p. 1689.) Bearing in mind that we review the trial court's reduced punitive damage verdict as if it had been rendered by the jury in the first instance (*West*, *supra*, 174 Cal.App.3d at p. 877), we see no basis to conclude the trial court abused its discretion in concluding that a total punitive damage award of $750,000 was sufficient.

For the same reasons, however, we reject defendants' contention on appeal that the punitive damage award was excessive. The record fully supports the conclusion that defendants' conduct was prolonged and reprehensible, and, on the facts of this case, an award of less than one and a half times the compensatory award falls within permissible limits.

## D. Attorney Fees

"The FEHA provides that 'the court, in its discretion, may award to the prevailing party reasonable attorney's fees and costs . . . .' (Gov. Code, § 12965, subd. (b).) In determining the fee award, the trial court must first determine 'a "lodestar" or "touchstone" figure, which is the product of the number of hours worked by the attorneys and a reasonable fee per hour.' [Citations.] The trial court then has the discretion to increase or reduce the lodestar figure by applying a positive or negative ' "multiplier" ' based on a variety of factors. [Citations.] We review the trial court's decision on attorney fees under an abuse of discretion standard. [Citation.]" (*Greene v. Dillingham Construction N.A., Inc.*( 2002) 101 Cal.App.4th 418, 422 (*Greene*).)

Plaintiff requested attorney fees under FEHA. (Gov. Code, § 12965, subd. (b).) She sought a lodestar amount of $776,033.05, and a multiplier of 2.0, thus requesting a total award of $1,552,066.10. The trial court awarded fees in the amount of $1,109,142, calculated as a lodestar of $739,428 and a multiplier of 1.5.

---

965, 974 [considering fact that plaintiffs would not have to pay attorney fees in concluding compensatory award was substantial and affirming trial court's order reducing punitive damage award].)

Defendants contend this fee award was excessive. They claim, first, that the lodestar amount was excessive because it included hours not reasonably spent in litigating plaintiff's claims. According to defendants, the fees awarded improperly reflect duplication of effort, unnecessary work, and excessive hourly rates. As support for this contention, they rely on two things: factual assertions about the work plaintiff's attorneys performed for which they provide no citations to the record, and an expert declaration submitted to the trial court in support of defendants' opposition to the motion for attorney fees, in which Andre E. Jardini opined that the billing records, pleadings, and other materials plaintiff submitted reflected excessive, vague, duplicative, and otherwise inappropriate billing and excessive hourly rates. Defendants provide not a single citation to the billing records or other documents in the record that might allow us to evaluate their contentions. As we have already explained, "it is counsel's duty to point out portions of the record that support the position taken on appeal," and we are "not required to search the record on [our] own seeking error." (*Del Real*, *supra*, 95 Cal.App.4th at p. 768.) Defendants' challenges to the lodestar figure are therefore waived. (*Ibid*.; see also *Nwosu*, *supra*, 122 Cal.App.4th at p. 1246; *Guthrey*, *supra*, 63 Cal.App.4th at p. 1115.)

Defendants also contend the trial court acted improperly in awarding a multiplier. "In FEHA cases, the trial court has the discretion to apply a multiplier or fee enhancement to the lodestar figure to take into account a variety of factors, including the quality of the representation, the novelty and difficulty of the issues presented, the results obtained and the contingent risk involved. [Citations.]" (*Greene*, *supra*, 101 Cal.App.4th at pp. 426–427; see also *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*).)

In considering these factors, the trial court first noted that the quality of the representation provided by plaintiff's counsel was high, but that it had already been incorporated into the lodestar itself, and that the jury trial was not extremely complex. The court went on: "Nevertheless, two pertinent factors militate in favor of an elevated lodestar in this litigation: the considerable contingent risks and the important results obtained. The successful prosecution of this civil rights lawsuit required the attorneys for

26

the plaintiff to advance certain sums, to run the risk that their large investment of time would be uncompensated, to choose to forgo other valuable work, and to accept the proposition that any compensation would likely be long delayed. [¶] The female plaintiff who suffered both sexual harassment and related acts of job discrimination fully prevailed. Her trial victory was much more significant than the actual dollars awarded to her by the jury. [Citation.] Public scrutiny of this sad work saga served to inform the community about contemporary issues of sexual harassment and discrimination." Based on these two factors, the trial court enhanced the lodestar with a 1.5 multiplier.

Defendants contend the trial court should not have considered the contingent nature of the plaintiff's fee arrangement with her counsel and the consequent delay in payment, particularly because the action was brought to vindicate plaintiff's private interests. For this proposition, they rely on *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128. The court in *Weeks* reversed an attorney fee award that included a 1.7 enhancement, in part on the ground that the private action was brought to benefit the plaintiff's own interests, rather than to benefit the public, and "urge[d] caution in awarding enhanced fees, particularly in private actions," based on the contingent nature of the award. (*Id.* at pp. 1170–1171, 1175.) Since *Weeks* was decided, however, our Supreme Court has made clear in *Ketchum* that the contingent nature of a fee award is a proper factor to consider in setting an enhancement. (*Ketchum*, *supra*, 24 Cal.4th at pp. 1132–1134, 1137–1138.) In explaining the rationale for fee enhancement in contingency cases, the court noted that attorneys who work on a contingency basis effectively "loan" their services. (*Id.* at p. 1132.) Other courts, including this division, have reached the same conclusion in considering attorney fee awards in FEHA actions. (See, e.g., *Greene*, *supra*, 101 Cal.App.4th at pp. 426–429 [concluding, based on *Ketchum*, that trial court erred in refusing to consider contingent risk in deciding whether to apply multiplier in FEHA action]; see also *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 399–400 [in considering enhancement in FEHA action, proper for court to consider delay in compensation in case taken on contingency basis].) We accordingly reject defendants' challenges to the trial court's use

27

of the contingent nature of the award and the resulting delay in payment to enhance the fee award.

Defendants also contend that delay in payment should not have been used to enhance the award because the delay was already factored into counsel's hourly rates, and that plaintiff's counsel was not precluded from performing other work, as shown by the fact that they represented Adriana C. in a lawsuit against the casino. Defendants do not cite any part of the record to support these assertions, and have accordingly waived them.[18] (*Del Real*, *supra*, 95 Cal.App.4th at p. 768.) In any case, the trial court stated explicitly that the factors on which it relied to enhance the award did not duplicate the factors used to calculate the lodestar. We see no basis to doubt this statement.

Finally, defendants contend the novelty and complexity of the case do not justify a multiplier. The trial court did not rely on this factor in enhancing the award, and accordingly we need not consider this argument.

### III.    DISPOSITION

The judgment and orders appealed from are affirmed. Plaintiff shall recover her costs on appeal.

_____
Rivera, J.

We concur:

_____
Ruvolo, P.J.

_____
Reardon, J.

---

[18] In fact, in a motion in limine in the trial court, defendants stated that little discovery had been done in Adriana C.'s "recently filed action" against the casino.